**Hearing Date: October 27, 2026 at 10:00 a.m., prevailing Eastern Time**
**Response Deadline: October 20, 2026 at 4:00 p.m., prevailing Eastern Time**

Robert A. Britton
Paul A. Paterson
Alana J. Page
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| RML, LLC[1] | ) | Case No. 22-10784 (DSJ) |
| Reorganized Debtor. | ) | |
| Tax I.D. No. N/A | ) | |

# NOTICE OF REORGANIZED DEBTORS' MOTION TO ENFORCE THE PLAN AND CONFIRMATION ORDER

**PLEASE TAKE NOTICE** that a hearing on the *Reorganized Debtors' Motion to Enforce the Plan and Confirmation Order* (the "Motion") will be held before the Honorable David S. Jones, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York (the "Court"), on **October 27, 2026 at 10:00 a.m., prevailing Eastern Time** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted via Zoom videoconference. Parties wishing to appear at the Hearing, whether in a "live" or "listen only" capacity, must make an electronic appearance through the "eCourtAppearances" tab on the Court's website (https://www.nysb.uscourts.gov/content/judge-david-s-jones) no later than 4:00 p.m. on the business day before the Hearing (the "Appearance Deadline"). Following the Appearance

[1] On May 30, 2023, the Court entered the *Order (I) Consolidating Remaining Matters Under the Remaining Case, (II) Entering Final Decree Closing Certain of the Chapter 11 Cases, (III) Changing the Case Caption of the Remaining Case, and (IV) Granting Related Relief*, *In re Revlon, Inc., et al.*, No. 22-10760 (DSJ) [Docket No. 1920], closing the affiliated chapter 11 cases and directing that all motions, notices, and other pleadings related to any of the affiliated debtors be filed in this case. Items filed on the docket of *In re RML, LLC*, shall be identified as "RML Docket No. [●]." The location of RML, LLC's service address for purposes of these Chapter 11 Cases is: 55 Water St., 43rd Floor, New York, NY 10041-0004.

Deadline, the Court will circulate by email the Zoom link to the Hearing to those parties who have made an electronic appearance. Parties wishing to appear at the Hearing must submit an electronic appearance through the Court's website by the Appearance Deadline and not by emailing or otherwise contacting the Court. Additional information regarding the Court's Zoom and hearing procedures can be found on the Court's website.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (each an "Objection") to the relief requested in the Motion shall: (a) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; and (b) be served so as to be actually received by **October 20, 2026, at 4:00 p.m., prevailing Eastern Time** (the "Objection Deadline") in a manner consistent with the *Revised Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief* [Docket No. 279] and the procedures set forth therein as Exhibit 1 (the "Case Management Procedures"), including, but not limited to, by serving any Objection on the parties listed in paragraphs 22 and 34 of the Case Management Procedures.

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Reorganized Debtors may, on or after the Objection Deadline, submit to the Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing. The Reorganized Debtors will file an agenda before the Hearing, which may modify or supplement the Motion to be heard at the Hearing.

**PLEASE TAKE FURTHER NOTICE that *your rights may be affected*. You should read the Motion carefully and discuss it with your attorney, if you have one. If you do not have an attorney, you may wish to consult with one.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion can be viewed and/or obtained by: (a) accessing the Court's website at www.nysb.uscourts.gov, or (b) from the Reorganized Debtors' claims and noticing agent, Kroll Restructuring Administration LLC, at https://cases.ra.kroll.com/revlon/ or by calling (855) 631-5341 (toll free) for U.S. and Canada-based parties or +1 (646) 795-6968 for international parties. Note that a PACER password is needed to access documents on the Court's website.

[*Remainder of page intentionally left blank.*]

New York, New York
Dated: October 6, 2026

*/s/ Robert A. Britton*

Robert A. Britton
Paul A. Paterson
Alana J. Page
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Reorganized Debtors*

**Hearing Date: October 27, 2026 at 10:00 a.m., prevailing Eastern Time**
**Response Deadline: October 20, 2026 at 4:00 p.m., prevailing Eastern Time**

Robert A. Britton
Paul A. Paterson
Alana J. Page
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| RML, LLC[1] | ) | Case No. 22-10784 (DSJ) |
| Reorganized Debtor. | ) | |
| Tax I.D. No. N/A | ) | |

**REORGANIZED DEBTORS' MOTION TO ENFORCE THE PLAN AND CONFIRMATION ORDER**

RML, LLC and its affiliates (collectively, "Revlon" or, before the effective date of their chapter 11 plan of reorganization, the "Debtors" and after the effective date of their plan of reorganization, the "Reorganized Debtors") hereby submit this motion (the "Motion") pursuant to sections 105(a), 524, and 1141 of title 11 of the United States Code (the "Bankruptcy Code"), rules 1015(c), 3020(d), and 9007 of the Federal Rules of Bankruptcy Procedure

[1] On May 30, 2023, the Court entered the *Order (I) Consolidating Remaining Matters Under the Remaining Case, (II) Entering Final Decree Closing Certain of the Chapter 11 Cases, (III) Changing the Case Caption of the Remaining Case, and (IV) Granting Related Relief*, *In re Revlon, Inc., et al.*, No. 22-10760 (DSJ) [Docket No. 1920], closing the affiliated chapter 11 cases and directing that all motions, notices, and other pleadings related to any of the affiliated debtors be filed in this case. Items filed on the docket of *In re RML, LLC*, shall be identified as "RML Docket No. [●]." The location of RML, LLC's service address for purposes of these Chapter 11 Cases is: 55 Water St., 43rd Floor, New York, NY 10041-0004.

(the "Bankruptcy Rules"), Articles VII.F, VII.G, and VIII.L.3 of the Plan,[2] and paragraphs 126 and 127 of the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] (the "Confirmation Order"), for entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Proposed Order"): (i) enforcing the Plan and Confirmation Order to preclude Zurich American Insurance Company and/or its affiliates (collectively, "Zurich") from attempting to impose defense costs on the Reorganized Debtors that they are not required to pay under their insurance policies with Zurich (the "Policies") and, therefore, under the Plan and the Confirmation Order, and requiring Zurich to: (a) pay all go-forward defense costs and (b) reimburse defense costs previously incurred in excess of the applicable Hair Straightening Deductible or SIR Obligation, in an amount to be agreed upon by the Reorganized Debtors and Zurich, or ordered by the Court if no agreement is possible; and (ii) permitting the Reorganized Debtors, upon further motion, to seek sanctions in the event that Zurich fails to comply with the Court's order within a reasonable period following entry thereof. In connection with the Motion, the Reorganized Debtors submit the declaration of Keith McKenna of Cohen Ziffer Frenchman & McKenna LLP, the Reorganized Debtors' coverage counsel, attached hereto as **Exhibit A** (the "McKenna Declaration").

## Preliminary Statement

1. Pursuant to a heavily negotiated settlement among the Debtors, their insurers (including Zurich), and the Hair Straightening Claimants (the "Insurer Settlement"), Zurich agreed that it would not seek to recover defense costs for claims pending in the Hair Straightening MDL

[2] Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the *Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860] (with all supplements and exhibits thereto, as it and they have been and may be amended, altered, modified, revised, or supplemented from time to time, the "Plan").

as Policy deductibles from the Reorganized Debtors, except to the extent the Reorganized Debtors were required to pay those costs under the Policies. Zurich is now reneging on that commitment by refusing to pay a cent of defense costs and instead wrongly attempting to force the Reorganized Debtors to bear those costs entirely. That refusal cannot be reconciled with the clear terms of the Policies, the Plan, the Confirmation Order, or the permanent injunction this Court entered to protect the settlement terms that Zurich actively negotiated.

2. Under the Insurer Settlement, the Reorganized Debtors assumed the Debtors' insurance policies and agreed to honor their corresponding obligations subject to a key limitation: the Reorganized Debtors are relieved from any requirement to pay any amounts on account of a Hair Straightening Deductible or SIR Obligation—that is, any amounts falling within any applicable and unexhausted deductible or self-insured retention under their insurance policies—except to the extent of Hair Straightening Claims Defense Costs. Plan, Arts. VII.F, VIII.L.3. Critically, Hair Straightening Claims Defense Costs only include costs the Reorganized Debtors are required to pay under their insurance policies. *Id.* In return, the insurers retained all policy obligations, including the broad duty to defend the Reorganized Debtors and to pay defense costs in accordance therewith in excess of any applicable deductibles or retentions.

3. Zurich—the Debtors' primary general liability insurer for many policy years applicable to Hair Straightening Claims—has failed to perform its end of the bargain under the Insurer Settlement entirely. It has refused to pay or reimburse the Reorganized Debtors' defense costs, and attempted to impose defense costs on the Reorganized Debtors beyond those required under the Policies—in clear violation of the Plan and Confirmation Order. Zurich has thereby required the Reorganized Debtors to spend [redacted] of dollars over three years defending

against claims in the Hair Straightening MDL—many multiples of the applicable $100,000 per-policy deductible.

4. Zurich's justification for its non-performance is meritless. Zurich contends that, before it is required to pay anything, the Reorganized Debtors must satisfy not one $100,000 deductible per Policy, but separate $100,000 deductibles (a) for every individual claimant and even then (b) for each of those claimants, for every policy year in which that claimant allegedly used a hair straightening product or suffered bodily injury from use of such a product. The consequences of that theory illustrate that it is flawed. Zurich asserts that a separate deductible must be paid for each of the more than 5,000 claimants in the MDL, and then, even for a single bellwether claimant whose individual defense costs already exceed [redacted], Zurich insists those costs be spread across 39 alleged years of use—[redacted] per year—so that the Reorganized Debtors would owe roughly $3.9 million for that unique case before Zurich pays a dollar. Applied across the thousands of claimants in the Hair Straightening MDL, many of whom allege to have used hair straightening products across multiple decades, Zurich's obligation to fund defense costs would never be triggered at all.

5. Zurich's position violates the Plan on its face. Article VII.F relieves the Reorganized Debtors of any obligation to pay, reimburse, or otherwise satisfy any Hair Straightening Deductible or SIR Obligation—precisely the types of obligations that Zurich is wrongly attempting to impose on the Reorganized Debtors—unless they are Hair Straightening Claims Defense Costs that the Reorganized Debtors are "required to pay" under their policies. Plan, Art. VII.F; *id.* Art. I.A.169. Accordingly, if—as is plainly the case here—the Reorganized Debtors are not required under their policies to pay these costs, they are *not* Hair Straightening Claims Defense Costs, and any attempt to impose them on the Reorganized Debtors as deductibles

violates the Plan. Article VIII.L.3 and paragraph 127 of the Confirmation Order reinforce that relief, permanently enjoining insurers from recovering any such Hair Straightening Deductible or SIR Obligation (the "Insurer Injunction"). Plan, Art. VIII.L.3; Confirmation Order ¶ 127.

6. Zurich cannot escape that result, because it negotiated these terms: Article VII.G.6 of the Plan identifies the Insurer Settlement as a compromise "between [. . .] the Debtors and Zurich," and this Court approved the provisions of the Plan embodying that settlement "in their entirety." Plan, Art. VII.G.6; Confirmation Order ¶ 126. Zurich actively participated in and consented to the terms of the Insurer Settlement, and it cannot now avoid its key obligations under it.

7. The consequences of Zurich's violation are severe. By attempting to impose defense costs on Revlon as purported deductibles without any basis in the Policies, Zurich is forcing the Reorganized Debtors to fund an enormous mass-tort defense alone, diverting resources from post-emergence operations, and threatening the fresh start the Plan was designed to deliver. Zurich's allocation theory would also severely impair the recoveries the Insurer Settlement promised Hair Straightening Claimants, who waived amounts within any deductible in exchange for the right to enforce judgments above those amounts against the insurers. This right may become meaningless for many claimants if they must first clear the multi-million-dollar, per-year deductible stack that Zurich seeks to impose. Returning to the example of the bellwether claimant above who alleges 39 years of use, Zurich's theory would require her to obtain a judgment exceeding approximately $3.9 million (the sum of the 39 separate $100,000 deductibles Zurich seeks to impose), less any defense costs allocated to the applicable deductibles, before she could recover a single dollar from Zurich. This materially deviates from the bargain struck with Hair Straightening Claimants under the Plan, which was designed to give them a direct path to recovery

against the insurers for amounts above the $100,000 deductible (understood to mean that each claimant was waiving no more than $100,000 in recovery on any judgment ultimately obtained).

8. The Reorganized Debtors have exhausted every consensual path. For more than three years, they have repeatedly demanded that Zurich honor the Insurer Settlement—by reimbursing defense costs already incurred and funding go-forward defense costs—and have explained why Zurich's coverage positions are wrong. *See* McKenna Decl. Exs. 2–5. Zurich has refused. *See id.* ¶ 7. After exhausting all avenues for a consensual resolution, the Reorganized Debtors now bring this Motion to request entry of an order enforcing the Plan and Confirmation Order to preclude Zurich from attempting to impose defense costs on the Reorganized Debtors that they are not required to pay under the Policies, and requiring Zurich to (a) pay all go-forward defense costs and (b) reimburse defense costs previously incurred in excess of the applicable Hair Straightening Deductible or SIR Obligation, and reserving the Reorganized Debtors' right to seek sanctions should Zurich fail to comply within a reasonable period.

## Jurisdiction

9. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012, Articles XIII.10, XIII.18, and XIII.20 of the Plan, and paragraph 195 of the Confirmation Order. The Reorganized Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The bases for the relief requested herein are sections 105(a), 524, and 1141 of the Bankruptcy Code and Bankruptcy Rules 1015(c), 3020(d), and 9007.

## Background

### A. Procedural Background

12. On June 15 and 16, 2022, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the instant cases. Each Debtor managed its assets as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code throughout the Chapter 11 Cases. The Debtors' cases were jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief* [Docket No. 51] entered by the Court on June 16, 2022.

13. On April 3, 2023, the Court entered the Confirmation Order, approving the Plan.

14. On May 2, 2023, the Reorganized Debtors filed the *Notice of (I) Entry of Confirmation Order, (II) Occurrence of Effective Date, and (III) Final Deadlines for Filing Certain Claims* [Docket No. 1869], disclosing that the Effective Date occurred on May 2, 2023, the Plan was substantially consummated, and the Debtors emerged from chapter 11.

### B. The Hair Straightening MDL

15. Article IX.A.6 of the Plan permits Hair Straightening Claimants who timely and properly filed Hair Straightening Proofs of Claim to commence, subject to the Plan's conditions and deadlines, actions against the applicable Debtors or Reorganized Debtors in the Hair Straightening MDL (or, if the Hair Straightening MDL has been terminated, the United States District Court for the Southern District of New York). Since the Effective Date, the Hair

Straightening MDL has served as the principal forum for liquidating Hair Straightening Claims against the Reorganized Debtors.

16. As of the date of this Motion, over 5,000 actions against the Reorganized Debtors remain pending in the Hair Straightening MDL. *See* McKenna Decl. ¶ 8. For more than three years, the Reorganized Debtors have actively defended those actions through fact and expert discovery, bellwether selection, motion practice, depositions, case-specific investigation, settlement evaluation, and trial preparation in the Hair Straightening MDL. *See id.* In addition, the Reorganized Debtors have expended significant resources defending against Hair Straightening Claims in this Court, which has resulted in the dismissal of tens of thousands of claims against the Reorganized Debtors. *See id.* These efforts have required substantial legal, financial, and operational resources as the reorganized enterprise has sought to stabilize operations after emergence. *See id.* To date, the Reorganized Debtors' defense costs are in excess of [redacted] *Id.* ¶ 6.

**C. The Plan's Insurer Settlement**

17. The Plan addresses insurance obligations for Hair Straightening Claims through interlocking provisions negotiated among the Debtors, insurers (including Zurich), and Hair Straightening Claimants. Taken together, these provisions provide for the Reorganized Debtors' assumption of all insurance policies on the Effective Date, which was intended in large part to provide Hair Straightening Claimants with a path to recovery on their claims. However, to avoid that path unduly burdening the Reorganized Debtors' post-emergence operations, it was subject to a waiver of the Reorganized Debtors' obligations to pay, reimburse, or otherwise satisfy Hair Straightening Deductible or SIR Obligations, other than as to Hair Straightening Claims Defense Costs.

18. Specifically, Article VII.F of the Plan governs the assumption of all insurance policies by the Reorganized Debtors on the Effective Date, subject to the waiver of the Hair Straightening Deductible or SIR Obligations. In pertinent part, Article VII.F provides:

> "Subject to Article VIII.L.3 of the Plan, and except as otherwise expressly provided in this provision or elsewhere in the Plan, the Reorganized Debtors shall honor all of the Debtors' obligations under the Debtors' insurance policies . . . provided that none of the Debtors, their Estates, the Reorganized Debtors, each of their respective Affiliates, or any other Entity shall have any obligation now or in the future to pay, reimburse, or otherwise satisfy any applicable Hair Straightening Deductible or SIR Obligations that are due or become due (or otherwise would become due) in the future under the terms of any insurance policy; provided further, that for the avoidance of doubt, the Reorganized Debtors shall honor the Debtors' obligations in respect of any Hair Straightening Claims Defense Costs."

Plan, Art. VII.F.

19. The Plan defines "Hair Straightening Claims Defense Costs" as:

> "[A]ny expense directly allocable to any Hair Straightening Claim under any insurance policy (including, but not limited to expenses arising from: (i) all supplementary payments as defined under any such applicable insurance policy; (ii) all court costs, fees, and expenses; (iii) all costs, fees, and expenses incurred for or in connection with all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts, or testimony, copies of any public records, alternative dispute resolution proceedings, investigative services, non-employee adjusters, medical examinations, autopsies, or medical cost containment; (iv) declaratory judgment, subrogation claims and proceedings; (v) any other fees, costs, or expenses reasonably chargeable to the investigation, negotiation, settlement, or defense of any Hair Straightening Claim under any insurance policy or agreement; and (vi) any interest accrued in connection with the foregoing) **<u>that a Debtor or Reorganized Debtor is required to pay directly or to reimburse an applicable insurer for pursuant to the terms of the applicable insurance policy</u>** and any agreements, documents, or instruments relating thereto (each as construed in accordance with applicable non-bankruptcy law)."

Plan, Art. I.A.169 (emphasis added).

20. Article VII.F and the definition of Hair Straightening Claims Defense Costs make clear that the only obligation retained by the Reorganized Debtors on account of a Hair Straightening Deductible or SIR Obligation is for defense costs, and only then to the extent those costs are required to be paid by the Reorganized Debtors under the applicable insurance policies.

21. Article VIII.L.3 of the Plan (incorporated in paragraph 126 and restated in paragraph 127 of the Confirmation Order) contains the operative injunction that permanently enjoins all insurers from attempting to recover amounts within a Hair Straightening Deductible or SIR Obligation. In pertinent part, Article VIII.L.3 provides:

> "All insurers under the Debtors' insurance policies are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors, the Reorganized Debtors, any of their respective Affiliates, or any other Entity, or any assets of the Debtors, the Reorganized Debtors, any of their respective Affiliates, or any other Entities, or any collateral or security provided by or on behalf of the Debtors, the Reorganized Debtors, any of their respective Affiliates, and/or any other Entities: (a) commencing or continuing in any manner any cause of action, lawsuit, or other proceeding of any kind seeking to recover any Hair Straightening Deductible or SIR Obligation, except to the extent such obligation is for any unpaid Hair Straightening Claims Defense Costs; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Hair Straightening Deductible or SIR Obligation, except to the extent such obligation is for any unpaid Hair Straightening Claims Defense Costs; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any Hair Straightening Deductible or SIR Obligation, except to the extent such obligation is for any unpaid Hair Straightening Claims Defense Costs; (d) asserting any right of setoff, subrogation, contribution, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any Hair Straightening Deductible or SIR Obligation, except to the extent such obligation is for any unpaid Hair Straightening Claims Defense Costs; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with

> respect to any Hair Straightening Deductible or SIR Obligation, except to the extent such obligation is for any unpaid Hair Straightening Claims Defense Costs."

Plan, Art. VIII.L.3; Confirmation Order ¶ 127.

22. Article VIII.L.3 further provides that "[n]o insurer shall have a Claim or other Cause of Action against the Debtors, their Estates, the Reorganized Debtors, their Affiliates, or any other Entity for any Hair Straightening Deductible or SIR Obligation, except to the extent such obligation is for any unpaid Hair Straightening Claims Defense Costs." Plan, Art. VIII.L.3.

23. At the same time, Article VIII.L.3 expressly preserves the insurers' affirmative coverage obligations, providing that "[n]othing herein shall in any way affect an insurance company's obligations under any insurance policy issued or providing coverage to the Debtors, their Estates, or the Reorganized Debtors to pay amounts due under any insurance policy, including amounts in excess of any applicable Hair Straightening Deductible or SIR Obligation [. . .]". *Id.*

24. Article VII.G of the Plan contains additional provisions specifically negotiated with certain insurers, including Zurich. Article VII.G.1 provides for the assumption of the Zurich Insurance Contracts, subject to the terms set forth in Articles VII.F and VIII.L.3. Those terms "are compromises between [. . .] the Debtors and Zurich with respect to Zurich's potential objections to the Plan and treatment of Hair Straightening Deductible or SIR Obligations." Plan, Art. VII.G.6. This language underscores Zurich's participation in negotiating the Plan's provisions regarding Hair Straightening Deductible or SIR Obligations and Hair Straightening Claims Defense Costs—making it all the more appropriate for Zurich to be held to the resulting terms.

**D. The Defense Cost Dispute**

25. Before the Reorganized Debtors emerged from chapter 11, they provided notice of Hair Straightening Claimants' bodily injury claims to Zurich, one of the Reorganized Debtors'

insurers obligated to provide coverage for those claims under nineteen primary layer Policies it issued from July 1, 2004 through July 1, 2023, as well as various excess-layer policies. *See* McKenna Decl. ¶ 5; *id*. Ex. 1 (8/14/23 Ltr.). Yet in the more than three years since then, Zurich has not paid a cent toward the Reorganized Debtors' costs incurred in defending these claims, leaving the Reorganized Debtors to fund over [redacted] out of pocket and creating a substantial impediment to their post-emergence success. *See id*. ¶¶ 6–7.

26. Zurich's only basis for non-payment is a spurious contention that, before it pays anything, the Reorganized Debtors must pay not just $100,000 (the deductible) in defense costs for each Policy they choose to access, but $100,000 for every individual claimant for every year since that claimant allegedly began using a hair straightening product. *See id*. Ex. 1 (8/14/23 Ltr.). Specifically, according to Zurich, each Hair Straightening Claimant's claim is a separate "occurrence"—each of which is subject to a separate $100,000 deductible—and all defense costs must be allocated "pro rata to each policy period triggered by that claimant's allegations." *Id*. Ex. 1 at 7. Zurich's position effectively means that Zurich will never pay anything towards the Reorganized Debtors' defense because it effectively multiplies the deductible by the number of years since a claimant allegedly used a product that contributed to her injury. Specifically, Zurich claims that, for even one claimant, Revlon must spread all defense costs among every policy year in place since that claimant alleges she used a Revlon hair straightening product and, only after the amount of costs in any year exceeds $100,000 will Zurich pay anything.[3] The Reorganized

[3] Zurich even contends that defense costs necessary to defend a Hair Straightening Claim must be spread in the same way, even though as a matter of law, they can be properly attributed by the Reorganized Debtors to any Hair Straightening Claim. McKenna Decl. Ex. 5. In particular, the Reorganized Debtors have incurred substantial "general" defense costs, such as legal fees and expenses to search for and produce documents, information, and testimony related to the hair straightening products at issue in the Hair Straightening MDL, that would exist for even a single claimant and may appropriately be attributed to the defense of any Hair Straightening Claim (such costs, "General Defense Costs"). However, Zurich contends these costs must be spread evenly among all Hair Straightening Claimants (an exercise that is particularly artificial given that the number of Hair Straightening

Debtors have repeatedly explained to Zurich that these arguments are spurious under the plain language of the Policies, governing law, and the requirements of the Plan. *See, e.g., id.* Ex. 2 (9/7/23 Ltr.); *id.* Ex. 3 (12/8/23 Ltr.); *id.* Ex. 4 (9/2/25 Ltr.); *id.* Ex. 5 (7/31/26 email); *see also id.* Ex. 8 (Zurich 2018 Policy, Two or More Of Our Policies End't.). But Zurich has steadfastly refused to pay anything towards the Reorganized Debtors' defense costs. *See id.* ¶ 7.

27. For example, even though the Reorganized Debtors have incurred more than [redacted] in General Defense Costs through June 2026 (*see id.* ¶ 6), Zurich still contends that it owes nothing because these costs must first be spread among the more than 5,000 Hair Straightening Claimants, such that less than [redacted] is "attributed" to any Hair Straightening Claimant's claim, and then that less than [redacted] must be spread evenly among all years since the claimant allegedly used a product—typically more than three decades—before Zurich's deductibles are applied. *See id.* ¶ 8; *id.* Ex. 6. So, under Zurich's theory, despite having paid more than [redacted] in General Defense Costs, less than [redacted] of those costs count towards the Reorganized Debtors' deductible ($100,000) under the Policies. Effectively, if Zurich were correct, the Reorganized Debtors would have to spend more than $15 billion in defense costs before Zurich would pay anything, and even then, Zurich would only pay a fraction of the Reorganized Debtors' defense costs going forward. The purported imposition of these enormous expenses on the Reorganized Debtors undermines the significant work in these cases by the Reorganized Debtors, their stakeholders, and this Court to restructure the Reorganized Debtors into a successful post-emergence business.

28. Indeed, just last month, Zurich even refused to pay the Reorganized Debtors' costs of defending certain bellwether claims selected for trial, even though the amount of those costs

Claimants asserting claims is continually in flux as claims against the Reorganized Debtors have been dismissed). *Id.* Ex. 6.

will obviously exceed $100,000 (even just for any individual bellwether claimant). *See id*. Ex. 5 (7/31/26 email to Zurich); *id*. Ex. 5.A (excerpted defense cost summary attachment to 7/31/26 email to Zurich); *id*. Ex. 6 (9/4/26 Zurich Response Ltr.); *id*. ¶¶ 7, 9. To take an example, even just the unique costs of defending the individual claims of one bellwether claimant, Karla Smith, have substantially exceeded [redacted]. *See id*. Ex. 5.A. But according to Zurich, "Karla Smith alleges she used Revlon hair relaxers from 1980 to 2019," and "[s]preading her defense costs over 39 years results in [redacted] per year, far below the deductible." *Id*. Ex. 6 (9/4/26 Zurich Ltr.). Under this approach, the Reorganized Debtors would have to pay approximately $3.9 million on Ms. Smith's single claim alone before they have satisfied any of Zurich's deductibles and Zurich is obliged to pay any defense costs. And, even then, Zurich claims it would only owe a mere pro-rata fraction of defense costs going forward because Zurich's Policies were in place only for a portion of the 39 years potentially implicated by Ms. Smith's Hair Straightening Claim. Zurich's wrongful attempts to force the Reorganized Debtors to pay all of these costs under the pretense that they are part of a deductible violate the clear terms of the Plan, which provides that insurers cannot recover deductibles from the Reorganized Debtors except for Hair Straightening Claims Defense Costs they are "required to pay"—a requirement that does not exist under the Policies for the costs here. Plan, Art. I.A.169.

## **Relief Requested**

29. Pursuant to sections 105(a), 524, and 1141 of the Bankruptcy Code, Bankruptcy Rules 1015(c), 3020(d), and 9007, Articles VII.F, VII.G, and VIII.L.3 of the Plan, and paragraphs 126 and 127 of the Confirmation Order, the Reorganized Debtors seek entry of the Proposed Order: (i) enforcing the Plan and Confirmation Order to preclude Zurich from attempting to impose defense costs on the Reorganized Debtors that they are not required to pay under the Policies and,

therefore, under the Plan and the Confirmation Order, and requiring Zurich to: (a) pay all go-forward defense costs and (b) reimburse defense costs previously incurred in excess of the applicable Hair Straightening Deductible or SIR Obligation, in an amount to be agreed upon by the Reorganized Debtors and Zurich, or ordered by the Court if no agreement is possible; and (ii) permitting the Reorganized Debtors, upon further motion, to seek sanctions in the event that Zurich fails to comply with the Court's order within a reasonable period following entry thereof.

**Basis for Relief**

30. Zurich's conduct violates the Insurer Settlement's central bargain. Article VII.F of the Plan relieves the Reorganized Debtors of any obligation to pay, reimburse, or otherwise satisfy any Hair Straightening Deductible or SIR Obligation, except for defense costs they are "required to pay" under the Policies, and Article VIII.L.3 further reinforces that relief by permanently enjoining every insurer from asserting any right to such amounts. Zurich is bound to these terms in particular: Article VII.G.6 of the Plan identifies Articles VII.F and VIII.L.3 as compromises negotiated "between [. . .] the Debtors and Zurich." Yet Zurich withholds all defense cost coverage on the single condition that the Reorganized Debtors first pay $100,000 deductibles claimant by claimant and year by year—precisely the Hair Straightening Deductible or SIR Obligations that Article VII.F eliminated. Demanding those amounts—which largely deprive both the Reorganized Debtors and Hair Straightening Claimants of coverage under the Policies—is a direct violation of the Insurer Injunction. Plan, Art. VII.F, VII.G.6, VIII.L.3(a)–(e); Confirmation Order ¶¶ 126–127.

31. The Policies place a broad duty to defend on Zurich, not the Reorganized Debtors, subject only to the Reorganized Debtors' obligation to first pay defense costs that fall within a Hair Straightening Deductible or SIR Obligation. *See, e.g.*, McKenna Decl. Ex. 7 (Policy, Zurich American Insurance Company, Policy No. GLO 3737031-10 for the policy period July 1, 2014

through July 1, 2015 (the "2014 Primary Policy")) at New York Changes – CGL Coverage Form End't, § I.A.1.a; *id.* at CGL Form, Supplementary Payments—Coverages A and B, § 1.a; *see also* Plan, Art. VIII.L.3. Each Policy under which the Reorganized Debtors are claiming has a $100,000 per occurrence deductible, and it was met years ago—indeed, the Reorganized Debtors have now paid [redacted] of dollars in defense costs in the Hair Straightening MDL. *See, e.g.*, McKenna Decl. Ex. 7 at Deductible Endorsement; *id.* ¶ 6. Zurich's argument that the Reorganized Debtors must pay $100,000 for every claimant for every year since she began using a Debtor's hair straightening product, before Zurich has any obligation to pay anything in defense costs, is legally untenable under both the plain Policy language and governing law.

32. *First*, Zurich's position that defense costs must be allocated on a "pro rata" basis to every individual Policy year in place since a claimant used a hair straightening product—requiring the Reorganized Debtors, for instance, to pay defense costs equaling 39 deductibles for Ms. Smith, who claims to have used hair straightening products for 39 years—is legally meritless. Zurich's Policies expressly obligate it to defend the entirety of *any* lawsuit potentially implicating their coverages, not just to defend a portion of a suit, or to pay a "pro rata" share of defense costs incurred for a suit. Indeed, Zurich's Policies expressly reference "pro rata" allocations in numerous provisions when Zurich only intends to pay or reimburse a "pro rata" share of an amount.[4] However, in the Policies under which Revlon claims coverage, Zurich nowhere states in

---

[4] *See*, *e.g.*, McKenna Decl. Ex. 7 (2014 Primary Policy) at DISCLOSURE OF IMPORTANT INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT (discussing "pro rata allocation in accordance with procedures established by the Secretary of Treasury"); FLORIDA - DISCLOSURE OF IMPORTANT INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT (same); CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT (same); FLORIDA CHANGES – CANCELLATION AND NONRENEWAL ENDORSEMENT (stating that "If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata."); NEW YORK CHANGES – CANCELLATION AND NONRENEWAL ENDORSEMENT (same and noting "[i]f the first Named Insured cancels, the refund may be less than pro rata", and "when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata"); VIRGINIA CHANGES – CANCELLATION AND NONRENEWAL ENDORSEMENT (stating that "[w]e will compute return premium pro rata" and "[w]hen this

its insuring agreements that it will only pay a "pro rata" share of covered defense or indemnity costs. To the contrary, it expressly states without qualification that it will defend any "suit" and "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.* Ex. 7 (2014 Primary Policy) at New York Changes – CGL Coverage Form End't, § I.A.1.a ("We [i.e., Zurich] will have the right and duty to defend the insured against any 'suit'…."); *see also id.* at CGL Form, Supplementary Payments—Coverages A and B, § 1.a (confirming Zurich "will pay, with respect to . . . any 'suit' against an insured we defend: a. ***All*** expenses we incur . . . d. ***All*** reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or 'suit', . . . [and] e. ***All*** court costs taxed against the insured in the 'suit'….") (emphasis added). Thus, Zurich is legally obligated under the plain terms of each Policy to pay ***all*** defense costs incurred in defending against a suit by a Hair Straightening Claimant. *See American Precision Indus., Inc. v. Federal Ins. Co.*, 648 F.Supp.3d 442, 449 (W.D.N.Y. 2022) (citing cases), *appeal dismissed and remanded*, 2025 WL 1088231 (2d Cir. Apr. 11, 2025) ("[B]ecause the plain language of the Primary Policies requires the Insurers to pay all costs and expenses that arise from defending any claim or suit which seeks damages on account of a covered occurrence, all sums allocation of defense costs is required in this case.").[5]

---

policy is cancelled at your request . . . we will return 90% of the pro rata unearned premium, rounded to the next higher whole dollar. . . ."); LOUISIANA CHANGES – CANCELLATION AND NONRENEWAL ENDORSEMENT (stating that, depending on the coverages, if the first Named Insured cancels, "the refund will not be less than 90% of the pro rata unearned premium, rounded to the next higher whole dollar" or "the refund will not be less than 75% of the pro rata unearned premium, rounded to the next higher whole dollar", and "[i]f we cancel, the refund will be pro rata").

[5] As the name suggests, "all sums" allocation permits a policyholder to assign all loss from a particular occurrence to any triggered policy year (subject to the total limit of liability available in that year), rather than spreading the loss "pro rata" across all implicated policy years.

33. Zurich's position is also contradicted by other terms in its Policies. For example, all of the Zurich primary Policies expressly cover damages because of bodily injury that continues, changes, or resumes after the policy period.[6] New York's highest court has held that this type of language requires an insurer to pay all sums covered by the policy, not just a "pro rata" share of those amounts, as Zurich advocates. *In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1146, 1156 (N.Y. 2016); *Olin Corp. v. American Home Assur. Co.*, 704 F.3d 89, 94 and 102 (2d Cir. 2012); *Mineweaser v. One Beacon Ins. Co.*, 2018 WL 7079526 (W.D.N.Y. May 30, 2018) ("As further support for all sums allocation, the Seaton policy also contains a continuing coverage provision extending the policy's protections for continuing injuries beyond the policy period, which would be irrelevant under pro rata allocation, which further supports all sums allocation.") (citing *In re Viking Pump, Inc.*, 27 N.Y.3d at 262). The Reorganized Debtors are therefore entitled under the terms of the Policies and applicable law to allocate all of their defense costs to any Policy triggered by the Hair Straightening Claimants' allegations and are not required to "pro rate" their costs among multiple insurance policies.

34. *Second*, Zurich's position that each Hair Straightening Claimant's claim is a separate "occurrence" under the Policies—requiring the Reorganized Debtors to pay a separate $100,000 deductible for each one of the more than 5,000 Hair Straightening MDL plaintiffs covered by its Policies—is also contradicted by the plain terms of its Policies. They clearly state that, for "Bodily Injury" claims, the $100,000 deductible for each occurrence applies to "[*a]ll* persons or organization[s]," and expressly "DOES NOT APPLY" to "each 'claim'" or to "*[a]ny*

6 *See, e.g.*, McKenna Decl. Ex. 7 (2014 Primary Policy) at New York Changes – CGL Coverage Form Endorsement, § A.1.e.; *see also id.* § I.1.c (absent prior knowledge, "bodily injury" during the policy period "includes any continuation, change or resumption of that 'bodily injury' . . . after the end of the policy period"); *see also* McKenna Decl. Exs. 3, 4 (letters from Keith McKenna to G. Darwick dated December 8, 2023 and September 2, 2025 discussing various policy provisions supporting an "all sums" allocation).

one person or organization." *See, e.g.*, McKenna Decl. Ex. 7 (2014 Primary Policy) at Deductible Endorsement (emphasis added). The Policies also make clear that a single "occurrence" can involve injury to more than one person. *See, e.g.*, *id.* at CGL Deductible End't, § C.1 (defining the each "occurrence" deductible to mean those sums payable "as the result of an accident, including continuous or repeated exposure to substantially the same harmful conditions, *regardless of the number of persons or organizations who sustain damages* or to whom sums are payable *because of that "occurrence"*) (emphasis added). Zurich's reading of its deductible endorsement would improperly convert the "per occurrence" deductible of its policy into a "per claim" deductible, even though that was not the deductible choice selected by the insured and on which premiums were based. *See, e.g.*, *United States Stove Co. v. Steadfast Ins. Co.*, 462 Fed. Appx. 912 (11th Cir. 2012) (rejecting insurer's attempt to apply "per occurrence" deductible to each claim when policyholder did not choose "per claim" deductible).

35. The Reorganized Debtors have already incurred more than $100,000 to defend some individual claims in any event. See McKenna Decl. ¶ 9. The vast majority of their defense costs result from discovery that is necessary to each of the Hair Straightening Claims—such as producing documents relating to their manufacturing, sale or distribution of hair relaxer products—and therefore can be properly allocated towards satisfying the deductible for any one of them. *See id*. Ex. 4 at 2; *id.* ¶ 6. Further, the Hair Straightening MDL is currently focused on certain bellwether claims, including eight bellwether claims against the Debtors. The defense costs unique to each of those claims—which are being prepared for trial—indisputably exceed $100,000. *See id.* ¶ 9.

36. For these reasons, Zurich is wrong that the Reorganized Debtors must continue to pay defense costs for the Hair Straightening MDL. Zurich's attempt to impose those costs on the

Reorganized Debtors as purported Hair Straightening Deductible or SIR Obligations violates the express terms of the Plan and Confirmation Order, which expressly preclude the insurers from recovering those amounts unless they are Hair Straightening Claims Defense Costs that the Reorganized Debtors are required to pay under the policies—which they are not.

* * *

37. Absent intervention, Zurich's position would read key aspects of the carefully negotiated Insurer Settlement, including the Insurer Injunction, out of the Plan. Because many of the thousands of pending cases in the Hair Straightening MDL allege exposure spanning multiple decades, Zurich's per-year, per-claimant construction would (by design) leave deductibles perpetually unsatisfied, eliminating Zurich's defense cost obligations entirely and imposing all those costs on the Reorganized Debtors. This would nullify the key component of the Insurer Settlement relieving the Reorganized Debtors of obligations on account of Hair Straightening Deductible or SIR Obligations.

38. Zurich's position equally threatens the recoveries the Plan promised Hair Straightening Claimants. Under the Insurer Settlement, Hair Straightening Claimants agreed to waive amounts within any Hair Straightening Deductible or SIR Obligation in exchange for the ability to assert judgments above those amounts against the applicable insurers. Plan, Art. VIII.L.3; *see also id*. Art. VII.G.6. The Plan expressly preserves the insurers' coverage obligations with respect to amounts above any Hair Straightening Deductible or SIR Obligation. Plan, Art. VIII.L.3. Yet based on the same reasoning Zurich advances here, a claimant could not recover against insurance proceeds unless her judgment exceeds the $100,000 deductible for each policy year in place after she used hair straightening products. Under the example outlined above, a claimant who allegedly used hair straightening products across 39 years would recover nothing

unless her judgment exceeds approximately $3.9 million. So if she obtained a $4 million judgment, Zurich would deem her to have waived $3.9 million—not just $100,000—as falling within applicable deductibles. And if her judgment were $3.9 million or less, Zurich would deem the entire amount waived, leaving her with no recovery from insurance proceeds at all. Although the Reorganized Debtors contest liability, to the extent Hair Straightening Claimants ultimately obtain judgments, Zurich's methodology would effectively bar those claimants from meaningful recoveries, deny them the benefits anticipated from the Insurer Settlement, and deprive the compromise they accepted under Article VII.G.6 of a principal part of its intended value.

39. For these reasons, the Court should enforce the Plan and Confirmation Order according to their terms, prevent Zurich from attempting to impose defense costs on the Reorganized Debtors that are not required by the Policies, and compel Zurich to pay all go-forward defense costs and to reimburse the defense costs already incurred in excess of the applicable deductible.

40. The Court has ample authority to issue the Proposed Order. Articles XIII.10, XIII.18, and XIII.20 of the Plan expressly reserve to this Court authority to restrain interference with enforcement of the Plan, hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, and enforce orders, judgments, injunctions, and rulings entered in the Chapter 11 Cases. Moreover, section 105(a) of the Bankruptcy Code confers broad authority on bankruptcy courts to enforce their own orders, including confirmation orders. *See* 11 U.S.C. § 105(a); *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *see also In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2d Cir. 2002) ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization.").

41. As a result, the Reorganized Debtors respectfully submit that the approval of the Proposed Order is in accordance with the relevant provisions of the Plan and Confirmation Order and is in the best interests of the Reorganized Debtors.

## Motion Practice

42. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Reorganized Debtors submit that this Motion satisfies rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## Notice

43. The Reorganized Debtors have provided notice of this Motion to (i) Zurich, (ii) the entities on the Master Service List (as defined in the *Revised Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief* [Docket No. 279] and available on the Reorganized Debtors' case website at https://cases.ra.kroll.com/revlon), and (iii) parties that have filed a request for service of papers under Bankruptcy Rule 2002. The Reorganized Debtors respectfully submit that no other or further notice is necessary.

## No Prior Request

44. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Reorganized Debtors respectfully request entry of an order substantially in the form of the Proposed Order granting the relief requested herein and such other relief as is just and proper.

New York, New York
Dated: October 6, 2026

*/s/ Robert A. Britton*
Robert A. Britton
Paul A. Paterson
Alana J. Page
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Reorganized Debtors*