**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| RML, LLC | ) | Case No. 22-10784 (DSJ) |
| Reorganized Debtor. | ) | |
| Tax I.D. No. N/A | ) | |

**OBJECTION OF ZURICH AMERICAN INSURANCE COMPANY TO REORGANIZED DEBTORS' MOTION TO ENFORCE THE PLAN AND CONFIRMATION ORDER**

Zurich American Insurance Company ("**ZAIC**") hereby opposes (this "**Objection**") the *Reorganized Debtors' Motion to Enforce the Plan and Confirmation Order* (the "**Motion**") [Doc. No. 1420] by RML, LLC and its affiliates (collectively, "**Revlon**" or, before the effective date of their chapter 11 plan of reorganization, the "**Debtors**," and after the effective date of their plan of reorganization, the "**Reorganized Debtors**") to enforce the *Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860] (the "**Plan**") and the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Confirmation Order**") [Doc. No. 1746]. Revlon's Motion is procedurally improper, seeks relief that cannot be granted by this Court, and relies on an incorrect reading of the relevant insurance policies and related contracts. Revlon's Motion seeks resolution of disputed issues concerning the application of the ZAIC Policies' deductibles to Hair Straightening Claims Defense Costs, not enforcement of a disputed Plan provision. In support of this Objection, ZAIC states as follows:

## BACKGROUND

### A. The ZAIC Policies

1. ZAIC issued nineteen consecutive annual commercial general liability policies to Revlon, incepting on July 1, 2004 and expiring on July 1, 2023 (the "**ZAIC Policies**").

2. Each of the ZAIC Policies contains a deductible endorsement that requires Revlon to pay allocated loss adjustment expense ("**ALAE**") – which, notably, includes attorney's fees and expenses – either on a pro rata basis, within the deductible amount, or outside limits.

3. Although the precise terms of these deductible endorsements vary by year, each endorsement includes a $100,000 deductible that applies to each "occurrence" (as such term is defined in the ZAIC Policies).

4. In connection with the ZAIC Policies, ZAIC and Revlon entered into a series of Deductible and Paid Loss Retrospective Rating Agreements ("**Deductible Agreements**"), which obligate Revlon to fund ALAE within the relevant deductibles.

### B. Revlon Bankruptcy

5. On June 15 and 16, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

6. On April 3, 2023, the Court entered a Confirmation Order approving the Plan.

### C. The Plan

7. ZAIC participated in the negotiation of the Plan, which contains numerous provisions relating to the ZAIC Policies. At a high level, the Plan provides that the Reorganized Debtors would assume all of the Debtors' insurance policies, including the ZAIC Policies, but that the Reorganized Debtors would be relieved of their obligations to pay, reimburse, or otherwise

satisfy any Hair Straightening Deductible or SIR Obligation except Hair Straightening Claims Defense Costs. Plan, Arts. VII.F, VIII.L.3.

8. Specifically, Article VII.F of the Plan provides:

> "Subject to Article VIII.L.3 of the Plan, and except as otherwise expressly provided in this provision or elsewhere in the Plan, the Reorganized Debtors shall honor all of the Debtors' obligations under the Debtors' insurance policies . . . provided that none of the Debtors, their Estates, the Reorganized Debtors, each of their respective Affiliates, or any other Entity shall have any obligation now or in the future to pay, reimburse, or otherwise satisfy any applicable Hair Straightening Deductible or SIR Obligations that are due or become due (or otherwise would become due) in the future under the terms of any insurance policy; provided further, that for the avoidance of doubt, **the Reorganized Debtors shall honor the Debtors' obligations in respect of any Hair Straightening Claims Defense Costs."**

Plan, Art. VII.F (emphasis added).

9. The Plan defines "Hair Straightening Deductible" as having the "meaning set forth in Article VIII.L.3." That section states, in part:

> Except with respect to the Debtors' directors' and officers' insurance policies, and notwithstanding any provisions to the contrary in any of the Debtors' insurance policies, the applicable insurers shall have no obligation to pay any amounts that are within any applicable and unexhausted deductibles or self-insured retentions on account of any Hair Straightening Claims (a "Hair Straightening Deductible or SIR Obligation") under any applicable insurance policy on account of Hair Straightening Claims that are discharged pursuant to the Plan and applicable law.

***

10. Article I of the Plan defines "Hair Straightening Claims Defense Costs" as:

> "[A]ny expense directly allocable to any Hair Straightening Claim under any insurance policy (including, but not limited to expenses arising from: (i) all supplementary payments as defined under any such applicable insurance policy; (ii) all court costs, fees, and expenses; (iii) all costs, fees, and expenses incurred for or in connection with all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts, or testimony, copies of any public records, alternative dispute resolution proceedings, investigative services, non-

> employee adjusters, medical examinations, autopsies, or medical cost containment; (iv) declaratory judgment, subrogation claims and proceedings; (v) any other fees, costs, or expenses reasonably chargeable to the investigation, negotiation, settlement, or defense of any Hair Straightening Claim under any insurance policy or agreement; and (vi) any interest accrued in connection with the foregoing) that a Debtor or Reorganized Debtor is required to pay directly or to reimburse an applicable insurer for pursuant to the terms of the applicable insurance policy and any agreements, documents, or instruments relating thereto (each as construed in accordance with applicable non-bankruptcy law)."

Plan, Art. I.A.169. Thus, although the Plan relieved Revlon of certain deductible and SIR obligations relating to Hair Straightening Claims, it expressly preserved Revlon's obligations with respect to Hair Straightening Claims Defense Costs.

11. The Plan does not endeavor to or purport to interpret or modify the terms of the ZAIC Policies. Quite the opposite. The Plan specifically provides:

> Except as expressly set forth in Articles VII.F and VIII.L.3 of the Plan, nothing alters, modifies, or otherwise amends the terms and conditions of the [ZAIC Policies] or the Chubb Insurance Contracts, any reinsurance agreements related thereto, and any rights and obligations (including, without limitation, any obligations or liabilities of any of the Debtors' Affiliates) and **<u>coverage thereunder shall be determined under the [ZAIC Policies] and the Chubb Insurance Contracts, as applicable, and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred.</u>**

Plan, Art. VII.G.3 (emphasis added).

> Except as expressly set forth in this Article VIII.L.3 or in Articles VII.F, VIII.L.2 or IX.A.6 of the Plan, nothing contained herein shall constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses held by such insurers.

Plan, Art. VIII.L.3.

12. On August 3, 2023, the Reorganized Debtors and ZAIC entered into a Ratification and Adoption Agreement whereby, pursuant to the Plan, the Reorganized Debtors assumed the Debtors' rights and obligations under the ZAIC Policies and the related Deductible Agreements. *See* Declaration of Gabriel Darwick ("**Darwick Dec.**") Exhibit A, Ratification Agreement.

### D. The Coverage Dispute

13. Subject to certain limitations, the Plan permits claimants with personal injury claims related to Revlon's hair straightening products (i.e. Hair Straightening Claimants) to bring actions against Revlon in the Hair Straightening MDL. Over 5,000 such actions are currently pending.

14. Revlon tendered these claims to ZAIC and its other insurers. In turn, ZAIC has communicated its position that, subject to certain reservations, it is willing to participate in Revlon's defense upon Revlon's payment of any Hair Straightening Defense Costs that must be paid pursuant to a Hair Straightening Deductible applicable to any "occurrence".

15. Determining the extent of Revlon's resulting deductible obligations requires consideration of, among other things, the number of "occurrences" presented by the underlying claims and the allocation of defense costs among the triggered policy periods. In its first coverage position letter to Revlon, in August of 2023, ZAIC succinctly addressed the "Number of Occurrences and Applicable Deductible Obligations," explaining that each claimant's alleged injury is "at least one occurrence per policy period," that the deductible endorsements require Revlon to pay "allocated loss adjustment expense (ALAE)," which includes "attorney's fees and expenses," and that the "most efficient method to allocate costs among the deductible is to allocate defense costs by claimant and then pro rata to each policy period[.]" *See* Revlon Motion, McKenna Decl. Ex. 1, p. 7.

16. For the past three years, Revlon has challenged ZAIC's interpretation of its policies and its application of New York law, primarily concentrating on the number of occurrences. *See, e.g.,* Revlon Motion, McKenna Decl. Ex. 2, p. 2 ("Zurich's conclusory contentions as to the number of occurrences—both of which lack any principled basis and find no support under the

ZAIC Policies or applicable law"); Ex. 3, p. 5 ("Zurich's broad and blanket contention that New York law necessarily requires each claim against Revlon to be treated as involving one or more separate occurrences is not supported"); Ex. 4, pp. 1-2 ("Revlon continues to dispute Zurich's contention that each Hair Relaxer claimant's claim is a separate 'occurrence' and that "Revlon is entitled under New York law to allocate all such defense costs to any one applicable policy period.")

17. For its part, ZAIC has continuously engaged in substantive dialogue with Revlon on policy interpretation and application of New York law to the policies. *See* Darwick Dec., Exhibit B, 10/12/23 Letter to Revlon, p. 4 ("Revlon describes Zurich's position on the number of occurrences as lacking 'any principled basis,' but Revlon provides neither a fact-based argument nor legal authority to contest ZAIC's position. ZAIC's position is well-supported by New York law. Tort claims arising from exposure to harmful conditions or harmful actions have consistently been treated as separate occurrences."); Exhibit C, p. 2, 3/3/25 Letter ("As explained in prior correspondence, under New York law, each claimant's alleged injuries represent at least one occurrence per policy period, thereby requiring Revlon's satisfaction of a deductible per claimant per policy period").

18. The parties have also disputed whether the ZAIC Policies are subject to pro-rata allocation, or what is known as "all sums" allocation. ZAIC's first coverage position letter made clear that pro rata allocation applied. *See* Motion, McKenna Decl. Ex. 1, p. (defense costs must be "pro rat[ed] to each policy period triggered by that claimant's allegations"). Revlon disagreed, arguing that under the "ZAIC Policies at issue here—courts apply an 'all sums' allocation methodology, not a 'pro rata' methodology." *Id.*, Ex. 2, p. 3.

19. In this myriad correspondence, neither Revlon nor ZAIC have ever treated the application of the Deductible Agreements as pre-determined by the Plan. To the contrary, Revlon's consistent pushback against ZAIC's policy interpretation and application of New York law has demonstrated the opposite to be true: each party's responsibilities for Hair Straightening Defense Costs are coverage issues to be decided under applicable non-bankruptcy law. Plan, Art. VII.G.3.

20. Revlon has even commenced a declaratory judgment action in New York state court against another of its insurers seeking a declaration on one of the disputed coverage issues here—pro rata allocation—that it seeks for this Court to resolve in the Motion. *See* Darwick Dec., Exhibit D, Revlon DJ Complaint. In Revlon's November 2024 Complaint against National Union Fire Insurance Company of Pittsburgh, PA ("AIG") (Index No. 659072/2024), Revlon alleges that it "turned to AIG to honor its coverage obligations and pay for millions of dollars Revlon has been forced to expend in its defense against the Hair Relaxer Litigation[.]" *Id.*, ¶7. But because AIG—like ZAIC—has taken the position that New York law requires pro rata allocation, Revlon has taken the position that AIG has incorrectly paid only a fractional share of Revlon's defense costs. *Id.*, ¶82 ("Nothing in the AIG Policies, including the Triggered AIG Policies, or applicable law permits AIG to avoid its obligation to provide Revlon with a complete defense for the Hair Relaxer Litigation").

21. While Revlon has recognized that a declaratory judgment action in state court is the appropriate mechanism and forum to resolve disputed coverage issues, Revlon has inexplicably sought to resolve its disputed coverage issues with Zurich through the Motion to "Enforce the Plan and Confirmation Order" Contrary to its long-standing view that ZAIC's payment obligations are controlled by the terms of policies and application of New York law, Revlon now asserts in the Motion that ZAIC's "position violates the Plan on its face." *See* Motion, p. 4.

22. In actuality, the Motion is nothing more than a thinly veiled attempt to repackage an insurance coverage dispute into a dispute over the interpretation of the Plan. Functionally, Revlon seeks a declaratory judgment adjudicating the post-bankruptcy coverage disputes that have arisen between ZAIC and Revlon under the ZAIC Policies. This is illustrated at every turn in the Motion, where Revlon's assertion that ZAIC is in violation of the Plan hinges on its own disagreement with ZAIC's interpretation of the Policies. The Plan preserves such disagreement for resolution under the ZAIC Policies and applicable non-bankruptcy law. Accordingly, the appropriate mechanism and forum for resolving those coverage issues is a declaratory judgment action in state court. The same issues are presently pending in ZAIC's state court declaratory judgment action against Revlon.

23. ZAIC does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## OBJECTION

### I. The Court Lacks Subject-Matter Jurisdiction Over This Coverage Dispute.

24. There is no rational argument that the issue presented to the Court by Revlon's Motion relates to a dispute over the Plan or its terminology. This is an insurance coverage dispute over the interpretation of insurance contracts that the Reorganized Debtors expressly assumed and adopted and which the Plan did not modify in any relevant way. As noted above, the Plan did not amend the terms of the ZAIC Policies and left them to be interpreted according to their terms and under applicable "non-bankruptcy law as if the Chapter 11 Cases had not occurred." Plan, Art. VII.G.3.

25. To be clear, ZAIC agrees that the Plan relieves Revlon of Hair Straightening Deductible or SIR Obligations other than Hair Straightening Claims Defense Costs. Practically speaking, this means that Revlon has no financial exposure for Hair Straightening Claims *except* for Hair Straightening Defense Costs that must be paid pursuant to a Hair Straightening Deductible.

26. Although Revlon claims a disagreement over the terms of the Plan, ZAIC is not aware of any actual dispute as to what the Plan requires. The present dispute is over the interpretation of the ZAIC Policies – not the enforcement of the Plan. Revlon cannot dispute that the Plan contains no provisions that actually relate to the current coverage dispute. The Plan leaves the ZAIC Policies in place to be interpreted as if Revlon had never entered bankruptcy. It does not dictate how many "occurrences" the claims within the Hair Straightening MDL represent under the ZAIC Policies. It does not dictate whether the ZAIC Policies are subject to pro rata allocation. The Plan leaves these issues – and other issues of policy interpretation – to another day and another forum. Plan, Art. VII.G.3.

27. It follows then that the Motion is a procedurally improper vehicle for this coverage dispute to be heard. To be sure, ZAIC agrees that a real and significant dispute exists between the parties and that the matter is one that is ripe for adjudication. However, the dispute does not belong in <u>this</u> Court, which did not retain jurisdiction to decide post-confirmation coverage disputes arising under the ZAIC Policies. To that end, ZAIC has filed a Complaint for Declaratory Judgment in the New York State Supreme Court that seeks to resolve the exact issues presented by Revlon's Motion through a proper mechanism and in a proper forum. *See* Darwick Dec., Exhibit E, Zurich DJ Complaint.

### A. The Motion, and the Disputes Before the Court, are Not within the Bankruptcy Court's "Core" Jurisdiction under 28 U.S.C. §§ 1334(b) and 157(a).

28. Without explanation, Revlon asserts that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. However, this is not the case. The scope of a bankruptcy court's jurisdiction is codified at 28 U.S.C. §§ 1334(b) and 157(a). Under these sections, bankruptcy courts have jurisdiction to adjudicate " . . . any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . . " 28 U.S.C. § 157(a). The first three enumerated categories of jurisdiction — "cases under title 11," "proceedings arising under title 11," and "proceedings arising in . . . a case under title 11," comprise the "core" jurisdiction of bankruptcy courts. The fourth and final category — "proceedings . . . related to a case under title 11" is referred to as the bankruptcy court's "non-core" or "related to" jurisdiction. *See, e.g., Gowan v. HSBC Mortg. Corp. (USA) (In re Dreier LLP)*, 2012 Bankr. LEXIS 4799, at *6-7 (Bankr. S.D.N.Y. Oct. 12, 2012); *Logan v. Westchester Fire Ins. Co. (In re PRS Ins. Group, Inc.)*, 445 B.R. 402, 404 (Bankr. D. Del. 2011).

29. "Generally, a core proceeding is one that invokes a substantive right under title 11, or could only arise in the context of a bankruptcy case." *Gowan*, 2012 Bankr. LEXIS 4799, at *6. Revlon's Motion lacks any substantive argument as to why the coverage dispute falls within the Court's core jurisdiction. The Motion seeks a declaratory judgment resolving the parties' coverage dispute in connection with the ZAIC Policies. However, courts routinely hold that insurance coverage disputes of this nature (i.e., involving actions by a debtor or trustee against the debtor's insurance provider) are <u>not</u> core proceedings under 28 U.S.C. §§ 1334(b) or 157(a). *See, e.g., Purdue Pharma L.P. v. AIG Specialty Pharms. L.P. (In re Purdue Pharma L.P.)*, 2021 U.S. Dist. LEXIS 216960, at *11-12 (S.D.N.Y. Nov. 8, 2021); *Scott v. AIG Prop. Cas. Co.*, 2017 U.S. Dist. LEXIS 58339, at *9 (S.D.N.Y. Apr. 17, 2017); *Kirschenbaum v. Fed. Ins. Co. (In re Ems Fin.*

*Servs., LLC)*, 491 B.R. 196, 203 (E.D.N.Y. 2013); *Silverman v. Tudor Ins. Co. (In re Lenders Abstract & Settlement Serv.)*, 493 B.R. 385, 394 (E.D.N.Y. 2013); *DeWitt Rehabilitation & Nursing Ctr., Inc. v. Columbia Cas. Co.*, 464 B.R. 587, 593 (S.D.N.Y. 2012); *Lawrence Group v. Hartford Cas. Ins. Co. (in Re Lawrence Group, Inc.)*, 285 B.R. 784, 788 (N.D.N.Y. 2002); *Green v. Mitsui Sumitomo Ins. Co. (In re TK Holdings, Inc.)*, 2021 Bankr. LEXIS 3462, at *24 (Bankr. D. Del. Dec. 20, 2021).[1] This is consistent with the Supreme Court's ruling that "[t]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982).

30. Disputes over the meaning and interpretation of insurance contracts are "not unique or uniquely affected by the bankruptcy proceeding." *Purdue Pharma*, 2021 U.S. Dist. LEXIS 216960, at *11. For example, in *Mitsui*, the court addressed a similar dispute in which the Trustee and an insurer of the debtor disagreed as to whether certain deductibles and retentions had been satisfied. *Mitsui*, 2021 Bankr. LEXIS 3462, at *14. As in this case, the bankruptcy plan did not alter the terms of the relevant policies. *Id.* at *23. Although the trustee argued that the dispute presented a "core" issue that was inextricably tied to the bankruptcy plan, the Court disagreed because "the declaratory relief requested requires analysis of the insurance coverage under the MSI Policies, rather than the Plan itself." *Id.* In dismissing the trustee's adversary proceeding on jurisdictional grounds, the court further held that "[d]etermining coverage under the MSI Policies is not an issue that arises only in the context of the bankruptcy case. The issues regarding how the Plan's allowed claim amounts or the paid claim amounts affect MSI's coverage obligations first

[1] *See also In re United States Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997); *PRS*, 445 B.R. at 404; *G-I Holdings, Inc. v. Hartford Acc. & Indem. Co. (In re G-I Holdings, Inc.)*, 278 B.R. 376, 381 (Bankr. D.N.J. 2002).

requires analysis of the parties' rights and obligations under the terms of the MSI Policies…., at its root, the claim for declaratory relief is an insurance coverage dispute…and is not a core issue." *Id.*, at *23-24.

31. This case is no different. The dispute between Revlon and ZAIC is purely a dispute over the application of the ZAIC Policies—and, in fact, involves some of the same legal issues Revlon is currently litigating against AIG in New York state court. It has nothing to do with the terms of the Plan and would exist regardless of Revlon's bankruptcy. Indeed, the dispute exists precisely because Revlon agreed, in the negotiated Plan, that its duty to pay Hair Straightening Claims Defense Costs within the deductibles of the ZAIC Policies would be unaffected by its bankruptcy. The Plan did not disturb the pre-bankruptcy status-quo as to the parties' rights and obligations in this regard. A dispute over the terms of the ZAIC Policies rather than the Plan itself is too attenuated to fall within the Court's "core" jurisdiction. Revlon's Motion does not explain why the Court should depart from the broad body of case law holding that coverage disputes of this nature are outside of this Court's "core" jurisdiction.

### B. The Motion is Not Within the Bankruptcy Court's Limited Post-Confirmation "Related To" Non-Core Jurisdiction.

32. Bankruptcy courts may exercise jurisdiction over "non-core" proceedings that are within the scope of the Court's "related to" jurisdiction—*i.e.*, those proceedings that are "related to a case under title 11" within the meaning of 28 U.S.C. § 157(a). However, where, as here, a dispute or proceeding is before the Court after a chapter 11 plan has been confirmed, the scope of a bankruptcy court's "related to" non-core jurisdiction is limited. *See, e.g., In re MGM Studios*, 459 B.R. 550, 556 (Bankr. S.D.N.Y. 2011); *PRS*, 445 B.R. at 405. "Post-confirmation, the bankruptcy court may only exercise jurisdiction where a claim has 'a close nexus to the bankruptcy plan or proceeding' and the matter at issue 'affects the interpretation, implementation,

consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement.'" *PRS*, 445 B.R. at 405 (quoting *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.*), 372 F.3d 154, 168-169 (3d Cir. 2004)). *See also MGM Studios*, 459 B.R. at 556. However, the mere potential to increase assets available to satisfy claimants does not constitute a sufficient "close nexus." *PRS*, 445 B.R. at 405. If the bankruptcy case "has been fully administered and the resolution of the dispute will not affect the interests of creditors, a bankruptcy court may decline to exercise post-confirmation jurisdiction." *MGM Studios*, 459 B.R. at 556.

33. Here, the dispute that has been framed by Revlon's Motion relates purely to the parties' respective obligations to pay defense costs in the Hair Straightening MDL. The interpretation of the deductible provisions of the ZAIC Policies does not contain the requisite "close nexus" to the Plan, and therefore does not fall within the Court's limited post-confirmation "related to" non-core jurisdiction.

## II. The Relief Sought by Revlon in the Motion is Procedurally Improper.

34. Even if Revlon's invocation of this Court's jurisdiction over this dispute as a "core proceeding" were proper, which it is not, Revlon cannot obtain relief that is tantamount to a declaratory judgment by way of a motion. Federal Rule of Bankruptcy Procedure 7001 clearly provides that "[t]he following are adversary proceedings: (a) a proceeding to recover money or property […] (i) a proceeding to obtain a declaratory judgment related to any proceeding described in (a)–(h)." Revlon's Motion seeks declaratory relief and, therefore, at a minimum, must be brought in the form of a complaint in an adversary proceeding.

35. Instead of utilizing a procedural vehicle that would afford due process, discovery, appropriate briefing and a coordinated trial, Revlon is attempting to short-circuit the required adversary procedure process and needlessly cram the same process into a period of a month. The

declaratory relief Revlon seeks implicates tens of millions of dollars in defense fees. A request of this magnitude should be litigated fully and properly, not decided on a shoehorned Motion to Enforce. By filing its own Complaint for Declaratory Relief in New York State Court, ZAIC seeks to have this coverage dispute litigated and resolved through a fulsome, proper proceeding.

36. This Court can deny the Motion on procedural grounds alone. *See, e.g., Mitsui*, 2021 Bankr. LEXIS 3462, at *12-13 ("the Trustee filed a Motion to Enforce Plan and Confirmation Order before this Court. The Court issued a letter ruling denying the Trustee's motion, concluding that the Trustee's claims must be brought through an adversary proceeding."). In *Mitsui*, a Trustee filed a Motion to Enforce the Plan and Confirmation Order against an excess insurer, contesting its interpretation of how underlying limits and self-insured retentions are exhausted. *See* Darwick Dec., Exhibit F, Trustee Motion to Enforce. The *Mitsui* court swiftly dispensed with the motion, recognizing it to be "procedurally improper" as it sought either "an injunction against [the insurer] or a request for declaratory judgment." *See* Darwick Dec., Ex. G, Order dated 10/23/20.

37. The Motion's procedural deficiency is not merely a technical fault. By thwarting the procedural requirements under Bankruptcy Rule 7001, Revlon asks the Court to resolve numerous complex coverage disputes related to the deductible endorsements of the ZAIC Policies, the Deductible Agreements, the number of "occurrences" at issue in the Hair Straightening MDL, and the proper trigger and allocation of coverage applied to unique bodily injury claims without a well-established injury mechanism. This approach substantially reduces the due process ZAIC would have been afforded under an adversary proceeding (or the process that it will be afforded in the New York State court declaratory judgment action). Such a result is as inequitable as it is procedurally improper.

38. Solely to the extent the Court is inclined to consider the Motion in any regard at this point, ZAIC requests that the Court limit its ruling to the issue of the Court's subject matter jurisdiction over the coverage dispute. To that end, ZAIC still requests a full and fair opportunity to litigate the same, consistent with the due process to which ZAIC would be afforded in the context of an adversary proceeding. ZAIC is entitled to seek reasonable discovery, submit supplemental briefing, present relevant evidence, and to seek additional authority.

## III. ZAIC's Coverage Position is Supported by the ZAIC Policies and New York Law.

39. Not only is Revlon's Motion procedurally improper for the reasons discussed above, but the relief it seeks is not supported by the terms of the ZAIC Policies, the Deductible Agreements, or New York law. The contractual agreements between Revlon and ZAIC obligate Revlon to satisfy a $100,000 per-occurrence deductible, inclusive of attorney's fees and costs, before ZAIC has an obligation to defend (or indemnify) its insureds. As of this date, Revlon has not satisfied the deductibles, but ZAIC has repeatedly acknowledged its willingness to provide coverage upon satisfaction of any applicable deductible(s). ZAIC's interpretation of the terms of the ZAIC Policies is consistent with New York law, and therefore, Revlon would not be entitled to the relief it seeks even if the Motion were procedurally proper.

### A. Revlon is Obligated to Fund Defense Costs Within the Deductibles.

40. As noted, each of the ZAIC Policies contains a deductible endorsement that includes a $100,000 deductible that applies to each "occurrence" and applies to ALAE. The precise terms of the endorsements differ slightly. However, by way of example, the 2014 ZAIC Policy includes a $100,000 per occurrence deductible and, for Allocated Loss Adjustment Expense, Option 3 is selected. *See* Motion, McKenna Decl. Ex. 7, pp. 242-244. Option 3 states: "[a]s respects

each 'occurrence,' each 'claim' or each 'accident' (as applicable), 'ALAE' is reimbursed and included in the Deductible Amount." The Endorsement further states in part:

> A. How This (These) Deductible(s) Apply(ies);
>
> You agree to reimburse us for each "occurrence", each "claim" or each "accident" up to the Deductible amount shown in the Schedule above:
>
> 1. All sums payable for other than "ALAE"; plus
>
> 2. All "allocated loss adjustment expense" as respects each "occurrence", "claim" or "accident":
>
>    a. When you have elected Option 1 in the Schedule above, in addition to and not limited by the deductible amount, or
>
>    b. When you have elected Option 2 in the Schedule above, in addition to but not limited by the deductible amount if sums payable for other than "ALAE" are equal to or less than the deductible amount; or a 16rorate share of total "ALAE" if the sums payable for other than "ALAE" exceed the deductible amount, or
>
>    c. When you have elected Option 3 in the Schedule above, as part of the deductible amount.

The Endorsement further provides:

> Each "Occurrence" means:
>
> For any coverage described in the Schedule to which the each "occurrence" basis applies, to all sums payable for other than "ALAE" as the result of an accident, including continuous or repeated exposure to substantially the same harmful conditions, "regardless of the number of persons or organizations who sustain damages or to whom sums are payable because of that "occurrence."

And that:

> "Allocated loss adjustment expense" is an expense directly allocable to a specific claim and shall include but not be limited to all Supplementary Payments as defined under the Policy; all court costs, fees and expenses; costs of all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigation services, non employee adjusters, medical examinations, autopsies, medical cost containment; declaratory judgment, subrogation, and any other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or loss under the Policy.

> "Allocated loss adjustment expense" shall not include the fees, charges or costs of a third party administrator engaged to provide claim service or related services.

41. Although the precise terms of the Deductible Endorsements vary, each ZAIC Policy includes a $100,000 deductible that applies to each "occurrence." *Id.*, p. 242.

42. The Deductible Agreements Revlon entered into with respect to each ZAIC Policy, and later reaffirmed in the Ratification and Adoption Agreement, obligate Revlon to fund defense costs within the deductibles. They do this by requiring Revlon to fully fund a "Loss Fund" that covers all ALAE – including attorney's fees and expenses – until the relevant deductibles have been satisfied. For example, in 2014, Revlon, along with its former parent, MacAndrews & Forbes, entered into a Paid Deductible and Paid Loss Retrospective Agreement (the "**Master Agreement**") and a Paid Specifications to Paid Deductible and Paid Loss Retrospective Agreement (the "**Specifications**"). *See* Darwick Dec., Exhibits H and I.[2] The Master Agreement describes the deductible program. It states that "You [Revlon] will be billed for the claim payments within the Loss Limit(s), plus related expenses and assessments, as stated in the Specifications… A Loss Fund will be required so that funds are available to pay Your obligations within the Loss Limit(s)."

43. The Master Agreement provides that "the amount and operation of the Loss Fund are stated in the Specifications." Loss Fund is defined as "a non-interest bearing account where Your funds are held by Us [ZAIC] or a TPA [Third-Party Administrator] to provide for the payment of Your obligations within the Loss Limit(s) under the Policy(ies) prior to Your reimbursing Us or the TPA." Loss Limit means "the amount You are obligated to reimburse Us for each occurrence…and the Deductible Policy(ies) stated in the Specifications. Under this Agreement, the term Loss Limit(s) shall also include Deductible Amount(s)." The Specifications

---

[2] Similar agreements were in place for all ZAIC Policy years.

state that the Loss Limit includes a $100,000 each occurrence deductible and states that "ALAE is included in the Loss Limit(s) under the Policy(ies) and is reimbursed to Us by You up to the Loss Limit(s). We pay the ALAE excess of the Loss Limit." The Loss Billing section states that "The TPA will bill You directly for Paid Losses, Paid ALAE, and TPAF." In other words, under the terms of the Deductible Agreements, Revlon is responsible for fully funding the Loss Fund that covers all ALAE – including attorney's fees and expenses – until the relevant deductibles have been satisfied. ZAIC has no obligation to contribute to the "loss fund" or to otherwise cover any ALAE or pay for any defense costs until an applicable deductible has been exhausted.

44. In the course of the dispute over the interpretation of the deductibles, ZAIC has reminded Revlon of its obligation to fund the Loss Fund. *See* Darwick Dec., Ex C. ("the Master Agreement mandates that Revlon fund the Loss Fund, that ALAE be paid from the Loss Fund, that the TPA bill Revlon directly for paid ALAE, and that Revlon replenish the Loss Fund"). When Revlon did not respond, ZAIC advised, "Your silence also suggests Revlon is not abiding by the terms of the Master Agreement and Specifications by instructing defense counsel to submit bills to the TPA and by having the TPA pay ALAE through the Loss Fund." *See* Darwick Dec., Exhibit J, 7/23/25 Letter. Revlon thereafter claimed ignorance of the Master Agreement and Specifications it ratified through the Ratification Agreement and, in doing so, confirmed its violation of those terms. *See* Motion, McKenna Decl. Ex. 4.

45. Revlon's breach of the Deductible Agreements that were unaffected by the Plan and that Revlon subsequently ratified does not permit Revlon to impermissibly shift the burden of paying ALAE to ZAIC.

### B. Each Hair Straightening Claimant Alleges At Least One Occurrence Per Policy Year.

46. In its Motion, Revlon argues that ZAIC has improperly applied the per-occurrence deductibles in the ZAIC Policies. It says that it is improper to treat each Hair Straightening Claimant's alleged injuries as separate occurrences and that it should not be required to satisfy the deductible for each policy triggered by a particular Claimant's injuries. However, ZAIC's application of the relevant policy provisions is consistent with well-established New York law.

47. When it comes to evaluating the number of occurrences presented by an underlying lawsuit or group of lawsuits, New York courts apply the "unfortunate events" test. In applying this test, courts begin by looking to the definition of "occurrence" in the policy for any suggestion of an intent to group claims. *See Appalachian Ins. Co. v. General Elec. Co.*, 8 N.Y.3d 162, 173 (2007); *International Flavors & Fragrances, Inc. v. Royal Ins. Co. of Am.*, 46 A.D.3d 224, 228 (App. Div. 2007). Courts then examine "whether there is a close temporal and spatial relationship between the incidents giving rise to injury or loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors." *Appalachian*, 8 N.Y.3d at 171-172.

48. In applying this test, New York courts have consistently refused to group claims for injuries allegedly caused to different claimants by the same product or activities. For example, in *Appalachian,* the court held that claims of exposure to asbestos in turbines, at work sites across the country, constituted separate occurrences. *Id.*, at 174. Similarly, in *Bausch & Lomb Inc. v. Lexington Ins. Co.*, the court held that the claimants' alleged exposures to the insured's contact solutions constituted separate occurrences. 679 F. Supp. 2d 345, 353–54 (W.D.N.Y. 2009) ("[T]here is no dispute that the incidents giving rise to liability: i.e., exposure to the plaintiff's contact lens solutions, occurred in thousands of different locations, at thousands of different times,

as a result of different solutions manufactured at different times and in different locations. The record reveals that claimants come from several different states and countries, allege different types of injuries, and allege that the exposure to the plaintiff's products took place in various locations at various times over the course of several years. As a result, there is no close temporal and spatial relationship between the incidents giving rise to the alleged injuries, and there is no basis for holding that the incidents can be viewed as part of the same causal continuum, without intervening agents or factors."), *aff'd* 414 Fed. Appx. 366, 370 (2d Cir. 2011) ("Like the district court, we conclude that the MoistureLoc incidents share few commonalities, differing in 'when and where exposure occurred,' how long or how often plaintiffs used MoistureLoc, and what intervening agents or factors existed."). *See also Roman Catholic Diocese of Brooklyn v. National Union Fire Ins. Co. of Pittsburgh, PA.*, 21 N.Y.3d 139, 153 (2013) (Roman Catholic Diocese I) (concluding that each incident of sexual abuse constituted a separate occurrence); *American Home Assur. Co. v. Port Authority of N.Y. & N.J.*, 2017 NY Slip Op 32500(U), ¶ 38 (Sup. Ct.) *aff'd* 166 A.D.3d 464 (App. Div. 2018) (claims related to exposure to spray on fireproofing constitute separate occurrences); *International Flavors*, 46 A.D.3d at 232-233 (respiratory injuries caused by exposure to diacetyl constitute separate occurrences). Just last month, the Appellate Division for the First Department held that concussion-related claims filed against the NFL as part of an MDL could not be grouped together. *Discover Prop. & Cas. Co. v. NFL*, 2026 NY Slip Op 05595, ¶ 11 (App. Div. 2026) ("given that each head impact was sustained by different players, at different times, in different places, throughout the entirety of each player's career, and over several decades, the incidents cannot be said to have been precipitated by a single causal continuum.").

49. The ZAIC Policies do not have any "grouping" language that would aggregate the alleged injuries of thousands of individual claimants who allegedly used different Revlon products

over different periods of time into one occurrence. The policies contain a standard "occurrence" definition that has been interpreted countless times under New York law. This language does not group claims unless they can be attributed to the same "identifiable precipitating event or 'accident.'" *International Flavors*, 46 A.D.3d at 229. *See also NFL*, 2026 NY Slip Op 05595 at * ¶ 12 ("the grouping provision does not contain language identifying the operative incident as the repeated head impacts leading to each player's injuries. There is also nothing to suggest that the head impacts constitute exposure to the same general conditions—they involved different players and took place in different stadiums, at different times, and under different circumstances.").

50. Applying the "unfortunate events test" to the Hair Straightening MDL, plaintiffs' alleged exposures to Revlon's hair straightening products constitute separate occurrences. Like the head injuries at issue in the NFL Concussion MDL or the eye injuries at issue in *Bausch & Lomb*, claimants' alleged injuries do not contain the requisite connection to be classified as a single occurrence. *See, e.g., NFL*, 2026 NY Slip Op 05595 at * ¶ 11 ("While the incidents giving rise to the injuries share some commonalities, it cannot be said that the impacts at issue here, which involve over 20,000 former players who participated in approximately 10,000 games over multiple decades, in approximately 90 different stadiums share the same 'temporal and spatial' characteristics 'to unify them as one occurrence.'"); *Bausch & Lomb*, 679 F. Supp. 2d at 353–54 ("[T]here is no dispute that the incidents giving rise to liability: i.e., exposure to the plaintiff's contact lens solutions, occurred in thousands of different locations, at thousands of different times, as a result of different solutions manufactured at different times and in different locations. The record reveals that claimants come from several different states and countries, allege different types of injuries, and allege that the exposure to the plaintiff's products took place in various locations at various times over the course of several years. As a result, there is no close temporal

and spatial relationship between the incidents giving rise to the alleged injuries.").

51. It should go without saying that the Hair Straightening Claimants did not use Revlon's products as part of any collective action. Each claimant applied the products separately, at different times and in different places across decades. Some claim to have used Revlon's products on a fairly consistent basis, while others used them sporadically. The claimants used different products with different chemical formulations that were manufactured, marketed, and sold at different times across the Revlon companies' history. While ZAIC does not concede that Revlon's products cause reproductive cancers as alleged by the Hair Straightening Claimants, there is no allegation that Revlon's products remain in the body for any extended period of time, causing continuous injury. In other words, each injury-causing event related to the use of a Revlon product must be viewed as a single occurrence. Certainly, there is no basis for aggregating the distinct claims of the thousands of Hair Straightening Claimants.

### C. For Each Claimant, Revlon Must Satisfy a Deductible for Each Triggered Policy.

52. As a general matter, each Hair Straightening Claimant alleges that she used Revlon's various products – often intermittently – over a number of years. Claims of this nature trigger coverage under all policy periods (and periods of non-coverage) during which injury is alleged. *See, e.g.*, *Roman Catholic Diocese*, 21 N.Y.3d at 154, *citing Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 222 (2002). Allocation of defense costs follows the same formula. *National Hockey League v. TIG Ins. Co.*, 76 Misc. 3d 427, 434 (Sup. Ct. 2022), citing *Danaher Corp. v. Travelers Indem. Co.*, 414 F. Supp. 3d 436, 454 (S.D.N.Y. 2019); *National Union Fire Ins. Co. of Pittsburgh, PA v. Roman Catholic Diocese of Brooklyn*, 2017 NY Slip Op

30368(U), ¶ 8 (Sup. Ct.) (Roman Catholic Diocese II).[3] Once per-occurrence defense costs are spread across all triggered policies, the insured – in this case, Revlon – must pay the applicable retention or deductible for each policy. *See Olin Corp. v. Insurance Co. of N. Am.*, 221 F.3d 307, 328 (2d Cir. 2000) ("when multiple policies are triggered and liability is allocated to each, each policy's deductible is applicable").

53. For example, in the *Roman Catholic Diocese* coverage litigation, the Court determined that plaintiffs' claims of sexual abuse constituted multiple occurrences and that defense and indemnity costs should be allocated across all years in which injuries had occurred. It then held that the insured must satisfy a "per occurrence" Self-Insured Retention ("**SIR**") for each occurrence and each policy year. *Roman Catholic Diocese I*, 21 N.Y.3d at 153; *Roman Catholic Diocese II*, 2017 NY Slip Op 30368(U) at ¶¶ 12-13 ("the $24 million plaintiffs National Union and Illinois National paid to defend the City and defend and indemnify the agencies in the underlying lawsuit must be allocated pro rata to the twenty-two annual periods of potential exposure between 1985 and 2007 -- the years in which the claimants allege that they were abused and that after the required pro rata allocation, the Diocese must satisfy a $250,000 SIR for each occurrence that resulted in bodily injury to each claimant during a particular policy period.").

54. ZAIC's position – that for each Hair Straightening Claimant, Revlon must satisfy at least one deductible for each year in which an injury is alleged to have occurred – is thus well-supported by New York law. *E.g., Roman Catholic Diocese I*, 21 N.Y.3d at 153 ("to permit the Diocese to exhaust a single SIR and then receive coverage from up to seven different policies

[3] Revlon's attempts to portray the ZAIC policies as requiring so called "all sums" allocation, such as what was required in *In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1146, 1156 (N.Y. 2016), falls flat. The ZAIC Policy "language 'simply sets forth the unremarkable proposition . . . [that] the policy in place when the injury occurs will cover all consequential damages, even those taking place after the policy period.' As such, the [provisions] do not counsel against pro rata allocation." *Radiator Speciality Co. v. Arrowood Indem. Co.*, 383 N.C. 387, 417 (2022) (quoting *New England Insulation Co. v. Liberty Mut. Ins. Co.*, 83 Mass. App. Ct. 631, 637, 988 N.E.2d 450 (2013)).

would conflict with the plain language of the policies, and produce an outcome not intended by the parties.”). The position reflects the bargain Revlon agreed to and ratified. Revlon agreed to this arrangement when it first negotiated the “per occurrence” deductibles in the Policies. Revlon reaffirmed the arrangement when it negotiated Revlon’s continued obligation for Hair Straightening Defense Costs, but not any other Hair Straightening Deductible obligation as part of the Plan. Finally, Revlon ratified this arrangement once more when it entered into the Ratification and Adoption Agreement post-bankruptcy.

55. Similarly, ZAIC’s treatment of so called “general” defense costs is not only rational, but well supported. The fact that the claims have been consolidated in an MDL does not change the fact that each case within the MDL constitutes a separate legal action. Therefore, where defense costs cannot be clearly allocated to a particular lawsuit or subset of lawsuits, courts have regularly concluded that the most rational approach is to divide the defense costs equally to each case counsel is tasked with defending. *Cf., Nat’l Foam, Inc. v. Zurich Am. Ins. Co.*, 768 F. Supp.3d 1009 (C.D. Cal. 2025) (requiring the duty to defend 182 cases within an MDL to be evaluated on a case-by-case basis); *Federal Ins. Co. v. 3M Co.*, 2022 U.S. Dist. LEXIS 237440, at *31-32 (D. Minn. Nov. 23, 2022) (holding that MDL cases retain their separate legal identity and allocating defense costs among covered and uncovered lawsuits within MDL); *Pa. Mfrs’ Ass’n Ins. Co. v. N.C. Mut. Wholesale Drug Co.*, No. 19-1045, 2020 U.S. Dist. LEXIS 255526, 2020 WL 9815386, at *7 (M.D.N.C. Sept. 30, 2020) (“In an MDL, where individual cases are consolidated for pretrial purpose but remain fundamentally separate actions, 28 U.S.C. § 1407, it appears that each case would need to be analyzed separately to determine the duty to defend.”). *See also Budd Co. v. Travelers Indem. Co.*, 820 F.2d 787, 791 (6th Cir. 1987) (allocating defense costs between covered

and uncovered lawsuits).[4]

56. Rather than confront this authority or offer any of its own, Revlon argues that ZAIC's reading would cause it to incur substantial Hair Straightening Defense Costs and limit claimants' recoveries under the ZAIC Policies. But these purported equitable considerations are not part of the analysis. *See Breed v. Ins. Co. of North Am.*, 46 N.Y.2d 351 (1978) ("This court may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation, since 'equitable considerations will not allow an extension of the coverage beyond its fair intent and meaning in order to do raw equity and obviate objections which might have been foreseen and guarded against.'") (citing *Weinberg & Holman v. Providence Washington Ins. Co.*, 254 NY 387, 391; *see* 1 Couch, Insurance [1929], § 184, p 376).

57. Nor do purported equitable considerations favor Revlon. Revlon negotiated to relieve itself only of an indemnity obligation owed under a Hair Straightening Deductible, not Hair Straightening Defense Costs. It did so through sophisticated counsel and with knowledge of the Hair Straightening Claims and the consistent body of New York law on the number of occurrences and allocation. Having struck a bargain with ZAIC that rendered it liable for Hair Straightening Defense Costs payable under a Deductible Agreement, Revlon's attempt to now resort to equity to relieve itself of that commitment should be dismissed outright.

58. In short, ZAIC is confident that when its coverage position is fully litigated in a proper forum, it will prevail. There is no basis to conclude that, by allocating defense costs as it has done, ZAIC has breached the terms of the ZAIC Policies. There is certainly no basis to conclude that ZAIC has breached the terms of the Plan.

59. The cases discussed above highlight just how inappropriate it would be for this

4 To be clear, when defense costs can be allocated to individual claimants – for example, in the context of MDL bellwether cases – ZAIC has allocated the costs accordingly.

Court to enter an order declaring the coverage obligations of ZAIC in this procedural context. What Revlon seeks is, in essence, a declaration of its rights under the Policies as to complex questions of law. The Motion has absolutely nothing to do with enforcing the terms of the Plan itself, and the Court should not countenance Revlon's attempts to seek this inappropriate relief. However, if the Court is inclined to consider Revlon's Motion on the merits, it should deny the requested relief because ZAIC's application of the terms of the ZAIC Policies has been correct and appropriate.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Zurich American Insurance Company respectfully requests that the Court deny Revlon's Motion and/or abstain from exercising jurisdiction or entering any order with respect to the insurance coverage disputes at issue in the Motion.

**WHITE AND WILLIAMS LLP**

By: */s/ Gabriel Darwick*
Gabriel E. Darwick, Esq. (4787594)
810 Seventh Avenue, Suite 500
New York, New York 10019
*Attorneys Zurich American Insurance Company*