# EXHIBIT F

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| TK HOLDINGS, INC., *et al.*, | : | Case No. 17-11375 (BLS) |
| Debtors.[1] | : | Jointly Administered |
| | : | **Hearing Date: October 21, 2020 at 10:00 a.m. (ET)**<br>**Objection Deadline: October 14, 2020 at 4:00 p.m. (ET)** |

**MOTION TO ENFORCE THE ORDER CONFIRMING DEBTORS' FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND THE CONFIRMED PLAN BY THE TRUSTEE OF THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A) (collectively, the "Debtors"). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these Chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..... 1

JURISDICTION AND VENUE ..... 3

FACTUAL BACKGROUND ..... 4

I. The Bankruptcy Proceedings ..... 4

II. The Trust's Insurance Coverage ..... 6

III. The Trust's Current Payment Obligations ..... 7

IV. Mitsui's Refusal to Fulfill Its Obligations Under the Language of the Plan and Confirmation Order ..... 7

ARGUMENT ..... 8

I. The Court Should Enforce the Plan and Order Mitsui to Recognize the Trust as the Holder of the Debtors' Rights Under the Policies. ..... 8

II. The Court Has Jurisdiction Over This Core Proceeding. ..... 12

CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albany Ins. Co. v. Bengal Marine, Inc.*,
857 F.2d 250 (5th Cir. 1988) ....................11

*ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*,
No. 09-cv-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011) ....................10, 11

*In re Axiant, LLC*,
No. 09-14118 MFW, 2012 WL 5614588 (Bankr. D. Del. Nov. 15, 2012) ....................13

*In re Coho Res., Inc.*,
345 F.3d 338 (5th Cir. 2003) ....................9

*In re Cont'l Airlines, Inc.*,
236 B.R. 318 (Bankr. D. Del. 1999) ....................12

*In re Fed.-Mogul Glob. Inc.*,
684 F.3d 355 (3d Cir. 2012) ....................9

*Halper v. Halper*,
164 F.3d 830 (3d Cir. 1999) ....................13, 14

*Home Ins. Co. of Illinois v. Hooper*,
294 Ill. App. 3d 626 (Ill. App. 1st Dist. 1998) ....................11

*In re Honosky*,
6 B.R. 667 (S.D.W.V. 1980) ....................9

*In re Jason Pharmaceuticals, Inc.*,
224 B.R. 315 (Bankr. D. Md. 1998) ....................10

*In re Jet Florida Sys., Inc.*,
883 F.2d 970 (11th Cir. 1989) ....................9

*In re Lazy Days' RV Ctr., Inc.*,
724 F.3d 418 (3d Cir. 2013) ....................15

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*,
No. CIV CCB-03-3408, 2012 WL 734176 (D. Md. Mar. 6, 2012) ....................9, 10

*In re Resorts Int'l, Inc.*,
372 F.3d 154 (3d Cir. 2004) ....................15

*In re SemCrude, L.P.*,
No. 08-11525 BLS, 2011 WL 4711891 (Bankr. D. Del. Oct. 7, 2011) (Shannon, J.), *rev'd on other grounds in part sub nom. Cottonwood Partnership, LLP v. Kivisto* (*In re SemCrude L.P.*), No. BR 08-11525 BLS, Civ. No. 11-1174-SLR, 2012 WL 5554819 (D. Del. Nov. 15, 2012), *and subsequently rev'd on other grounds sub nom. In re SemCrude L.P.*, 796 F.3d 310 (3d Cir. 2015) ....... 12, 15

*In re Seven Fields Dev. Corp.*,
505 F.3d 237 (3d Cir. 2007) ....... 15

*Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.)*,
72 F.3d 1171 (3d Cir. 1996) ....... 13

*In re Touch Am. Holdings, Inc.*,
401 B.R. 107 (Bankr. D. Del. 2009) ....... 12, 13

*Tucker v. Am. Intern. Grp., Inc.*,
745 F. Supp. 2d 53 (D. Conn. 2010) ....... 9

*U.S. v. Takata Corp.*,
No. 16-CR-20810-04 (E.D. Mich. Jan. 2, 2018), ECF No. 54-1 ....... 7

*UNR Indus., Inc. v. Continental Cas. Co.*,
942 F.2d 1101 (7th Cir. 1991) ....... 10, 11

*In re Worldcorp, Inc.*,
252 B.R. 890 (Bankr. D. Del. 2000) ....... 15

**Rules and Statutes**

28 U.S.C. § 157(b) ....... 3, 13, 14

28 U.S.C. § 1334 ....... 3, 13

28 U.S.C. § 1409 ....... 4

Local Rules of Bankruptcy Rule 9013-1(f) ....... 3

Eric D. Green ("Trustee"), as trustee for the PSAN PI/WD Trust, d/b/a the Takata Airbag Tort Compensation Trust Fund (the "Trust"), hereby moves the Court (the "Motion") for an order enforcing the provisions of the Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors (Feb. 20, 2018) ECF No. 2116 (the "Plan"), as confirmed by this Court's February 21, 2018 *Findings of Fact, Conclusions of Law, and Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors*, ECF No. 2120 (the "Confirmation Order"). In support of the relief requested herein, the Trustee respectfully states and alleges as follows:

## PRELIMINARY STATEMENT

1. By this Motion, the Trustee respectfully asks the Court to enforce certain provisions of the Plan[2] and Confirmation Order, namely those concerning the Debtors' transfer of insurance rights to the Trust (the "Insurance Rights Transfer Provision") and the Plan's impact on the insurers' obligations to the Trust (the "Insurance Neutrality Provision").

2. The Insurance Rights Transfer and Insurance Neutrality Provisions operate together to support a cornerstone of the Plan—the structure for resolving and compensating the PI/WD Claims.[3] Section 5.10(a) of the Plan transferred the Debtors' liabilities for the PI/WD Claims to the Trust. Section 5.10(f) of the Plan—the Insurance Rights Transfer Provision—transferred the Debtors' rights to all proceeds under products liability insurance policies potentially applicable to those liabilities (the "PI/WD Insurance Policies") to the Trust so that it could evaluate and pay eligible PI/WD Claims. Section 5.10(x) of the Plan—the Insurance Neutrality Provision—expressly preserved any obligations that the insurers owed to the Debtors

---

[2] Except as otherwise noted, all capitalized terms have the definition set forth in the Plan.

[3] As used in this Motion, "PI/WD Claims" means claims alleging personal injuries or wrongful death allegedly caused by airbag inflators, seatbelts, or other products developed, designed, manufactured, marketed, or sold by the Debtors.

(and now the Trust) under the PI/WD Insurance Policies, as well as the insurers' coverage defenses under the PI/WD Insurance Policies. The intended end result (as set forth expressly in the Plan and the Confirmation Order) was to enable the Trust to pursue any rights and proceeds to which the Debtors would have been entitled for the PI/WD Claims under the PI/WD Insurance Policies, and to enable the insurers who issued those policies, including Mitsui Sumitomo Insurance Company, Limited ("Mitsui"), to raise any coverage defenses they otherwise would have had absent the bankruptcy. The Plan and Confirmation Order expressly prohibit insurers from reducing their obligations to pay based on the terms of the Plan.

3. Mitsui, which issued policies providing up to $120 million in coverage for the PI/WD Claims (the "Policies"),[4] was involved in negotiations regarding the Plan, entered an appearance in the bankruptcy proceedings, attended the confirmation hearing, and was fully aware of the Plan's Insurance Rights Transfer and Insurance Neutrality Provisions.

4. Yet, Mitsui now contends that the Trust's rights to any proceeds under Mitsui's Policies are limited to the amount the Trust is able to pay to injured claimants (i.e., "bankruptcy dollars"), rather than the actual real value of those claims—i.e., the total amount the Trust would pay for those claims were it able to pay them in full, and the amount the Debtors would have paid outside of bankruptcy until their funds exhausted.

5. Mitsui's argument places the Trust in an untenable Catch-22: the Trust's ability to pay claimants is contingent upon the insurance proceeds it recovers from Mitsui, but the Trust's ability to access available insurance proceeds from Mitsui is contingent upon the amount it pays claimants. If implemented, this approach would cynically extinguish the obligations that Mitsui

[4] The Policies, which together provide coverage from March 31, 2015 to April 11, 2018, are as follows: Policy Number NE61683053 (the "2015 Policy"); Policy Number NE69378135 (the "2016 Policy"); and Policy Number NE69376832 (the "2017 Policy").

Case 17-11375-BLS Doc 4226 Filed 09/30/20 Page 7 of 20

would have had to the Debtors in the absence of a bankruptcy, wherein Mitsui would have been required to pay each covered claim in full as it arose.

6. Mitsui's argument—a thinly veiled attempt to exploit the Bankruptcy Code's *pro rata* distribution of assets in order to limit its coverage obligations—directly contradicts the relevant Plan provisions and this Court's Confirmation Order. Both the Plan and the Confirmation Order provide that the Trust received rights to *all* insurance proceeds to which the Debtors would have had rights had it paid the claims in full absent the bankruptcy, and both expressly preserve Mitsui's pre-bankruptcy obligations under the Policies.

7. The Trustee seeks an order from this Court enforcing the Plan and Confirmation Order, by ordering Mitsui to comply with the Insurance Rights Transfer and Insurance Neutrality Provisions—i.e., to indemnify the Trust *in full* for any liability incurred in connection with claims that fall within the scope of the Policies' coverage.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012. Further, the Confirmation Order provides that the Court "shall[] retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code." Confirmation Order at 44.

9. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court has jurisdiction to enter a final order with respect thereto. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Trustee consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent

consent of the parties, cannot enter a final order consistent with Article III of the United States Constitution.

10. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### I. The Bankruptcy Proceedings

11. On June 25, 2017, the Debtors filed for Chapter 11 bankruptcy protection in response to insurmountable liabilities arising from the PI/WD Claims.

12. Mitsui actively participated in the bankruptcy proceedings. It filed an objection to the Plan (Feb. 6, 2018) ECF No. 1946, which it ultimately withdrew. Mitsui's counsel attended the confirmation hearing. Sign-In Sheet, ECF No. 2111.

13. The Court entered the Confirmation Order on February 21, 2018.

14. The Plan established the Trust and provided that the Trust "shall . . . assume the liability for all PSAN PI/WD Claims against the Debtors and the Protected Parties" and "shall administer, process, settle, resolve, liquidate, satisfy, and pay (from the designated funds therefor), as applicable, PSAN PI/WD Claims against the Debtors and the Protected Parties [and] Other PI/WD Claims against the Debtors[.]" Plan § 5.10(a).

15. The Plan further provided for the transfer of the Debtors' insurance rights to the Trust, as follows:

> Effective on the Effective Date, the Debtors shall irrevocably transfer, grant, and assign to the PSAN PI/WD Trust, and the PSAN PI/WD Trust shall receive and accept, **any and all of the Debtors' PI/WD Insurance Rights**. . . . This Insurance Rights Transfer is made to the PSAN PI/WD Trust for the benefit of Persons that have a Claim for compensation for damages against the Debtors.

*Id.* § 5.10(f)(i) (the "Insurance Rights Transfer Provision," as referenced above) (emphasis added).

16. The "PI/WD Insurance Rights" include:

> **any and all rights**, titles, privileges, interests, claims, demands, or entitlements of the Debtors **to any proceeds**, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under or attributable to any and all PI/WD Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt, PI/WD Insurance Rights shall include the PSAN PI/WD Insurance Rights.

*Id.* § 1.1 (emphasis added).

17. "PSAN PI/WD Insurance Rights" are:

> **any and all rights**, titles, privileges, interests, claims, demands, or entitles of the Debtors **to any proceeds**, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under or attributable to any and all PSAN PI/WD Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured, or unmatured, disputed or undisputed, fixed or contingent.

*Id.* (emphasis added).

18. The Plan included "insurance neutrality" language providing that neither the Plan nor the Confirmation Order "shall in any way operate to, or have the effect of . . . decreasing, or modifying (a) the . . . obligations of any of the Insurers or (b) any rights . . . of the Debtors arising out of or under any Insurance Policy." *Id.* § 5.10(x) (the "Insurance Neutrality Provision," as referenced above).

19. The Plan also stated that "[t]he Insurance Rights Transfer shall be governed by, and construed in accordance with, the Bankruptcy Code and the laws of Delaware, without regard to its conflict of law principles." *Id.* § 5.10(f)(viii).

20. The Confirmation Order—a final, non-appealable order—clearly stated that the Insurance Rights Transfer was "valid and enforceable under sections 541(e), 1123(a)(5)(B), and 1129(a)(1) of the Bankruptcy Code" and that "the Bankruptcy Code preempts any anti-assignment contractual provisions and applicable state law." Confirmation Order ¶ 55. It further

confirmed that neither the Plan nor the Confirmation Order "shall in any way operate to, or have the effect of . . . decreasing, or modifying (a) the . . . obligations of any of the Insurers or (b) any rights . . . of the Debtors arising out of or under any Insurance Policy." *Id.* ¶ 59(a).

21. In addition to the Plan and Confirmation Order, the PSAN PI/WD Trust Agreement (Mar. 26, 2018) ECF No. 2505-1 and PSAN PI/WD Trust Distribution Procedures (Mar. 26, 2018) ECF No. 2505-2 ("TDPs") demonstrate that the purpose of the Trust is to pay the PI/WD Claims, and that its ability to do so is dependent on its recovery of insurance proceeds. First, the PSAN PI/WD Trust Agreement provides that the purposes of the Trust are "to administer, process, settle, resolve, liquidate and pay PSAN PI/WD Claims," and "to administer, process, settle, resolve, liquidate, and pay Other PI/WD Claims." PSAN PI/WD Trust Agreement § 1.2(a)(ii), (iv). It also notes that the Trust "shall pay such claims from the . . . applicable PSAN PI/WD Insurance Proceeds," in addition to funds provided by other sources. *Id.* § 3.3(b)(i). Under the TDPs, the Trust pays claimants based upon the "Point Value" of their claims, as determined under the TDPs. When the Trust receives additional funds through insurance proceeds, the Trustee may "increase the Point Value due to a material change in the estimates of the PSAN PI/WD Trust's future assets" and "make supplemental payments" to the claimants. TDPs § 8.1.

## II. The Trust's Insurance Coverage

22. Takata Corporation purchased liability insurance coverage from Mitsui to protect itself—and the U.S.-based Debtors, who are additional insureds under the Policies[5]— against various risks, including risks associated with tort claims alleging bodily injury. As noted above, the Debtors' rights under the Policies transferred to the Trust pursuant to the Plan.

[5] *See* 2015 Policy, Endorsement 1B; 2016 Policy, Endorsement 25; 2017 Policy, Endorsement 25.

23. Subject to their terms and conditions, each of the Policies requires Mitsui to pay all sums that the Trust becomes legally obligated to pay for bodily injury claims against the Trust, as long as the claim for bodily injury within the meaning of such Policy was made during the policy period.[6]

**III. The Trust's Current Payment Obligations**

24. The Trust has received hundreds of claims since its formation and continues to evaluate claims on a rolling basis.

25. The Trust expects to receive substantial additional claims for years to come based on the thousands of proofs of claim filed during the bankruptcy that alleged bodily injury arising from the Debtors' products. The Trust's economists have projected that total liability for the PI/WD Claims will exceed $1 billion.[7]

26. To date, the Trust has been able to pay only a fraction of compensable PI/WD Claims with its available assets.[8]

**IV. Mitsui's Refusal to Fulfill Its Obligations Under the Language of the Plan and Confirmation Order**

27. The Trust has sought payment of $53,223,000 owed by Mitsui under the Policies for PI/WD Claims paid by the Trust to date.

28. In correspondence with the Trust, Mitsui has denied coverage for these amounts on the basis that the Policies have not yet been triggered because the underlying limits have not yet been reached. Mitsui argues that, even if the PI/WD Claims otherwise were eligible for

[6] 2015 Policy, Prods. & Completed Operations Liab. Ins. Coverage Part, § I; 2016 Policy, Prods./Completed Operations Liab. Coverage Form, § I.1.a; 2017 Policy, Prods./Completed Operations Liab. Coverage Form, § I.1.a.
[7] *See* Ex. A to the Special Master's Request for Approval of the Individual Restitution Fund Methodology at 16, *U.S. v. Takata Corp.*, No. 16-CR-20810-04 (E.D. Mich. Jan. 2, 2018), ECF No. 54-1.
[8] Specifically, the Trust has paid, on average, less than 10% of the total value of all claims deemed compensable to date.

coverage under the Policies, it is liable only for the amount of the Trust's actual distribution payments for compensable claims, rather than the full value of those claims.

## <u>ARGUMENT</u>

### I. The Court Should Enforce the Plan and Order Mitsui to Recognize the Trust as the Holder of the Debtors' Rights Under the Policies.

29. Mitsui's refusal to recognize the Trust's rights under the Policies as coextensive with the Debtors' prior rights under those Policies is an intentional disregard of the Plan's explicit language and the Court's Confirmation Order.

30. Mitsui's position contradicts the express language of the Insurance Rights Transfer Provision of the Plan, which transferred to the Trust "*all* rights" to "any proceeds" potentially applicable to the PI/WD Claims. *See* Plan at 22, § 5.10(f)(i) (emphasis added). This transfer of insurance rights to the Trust was a key component of the Plan, without which the personal injury creditors would not have supported it and the Court would not have confirmed it. *See* Transcript from Sept. 16, 2020 Hearing at 62, ECF 4213. Under Mitsui's view, the Trust would only be able to access a fraction of the value of the insurance proceeds to which it is entitled—well below what the plain language of the Plan provides and the agreement with the creditors contemplated.

31. Mitsui's position also conflicts with the Plan's Insurance Neutrality Provision, which explicitly states that nothing in the Plan shall "decreas[e] the . . . obligations of any of the Insurers." Plan § 5.10(x). Mitsui is seeking to do just that.

32. Furthermore, Mitsui is preventing the Trust from receiving the full benefit of the rights transferred by the Debtors under the Plan. Prior to the bankruptcy, the Debtors were entitled to coverage for "those sums that the insured becomes legally obligated to pay as

damages[.]"[9] As such, the Trust, too, is entitled to coverage for the legal obligation to pay, not the amounts it can afford to pay in the absence of insurance.

33. In addition to contradicting the plain language of the Plan and Confirmation Order, accepting Mitsui's position would allow it to escape its coverage obligations and unilaterally vitiate a source of recovery for Takata's victims, thus undermining a key element of the Debtors' reorganization. Such a position undermines the entire purpose of the trust structure and the well-established principle that the Bankruptcy Code is not intended to allow insurers to benefit from the insured's bankruptcy. *See, e.g., In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 364, 378 (3d Cir. 2012) (approving transfer of debtor's insurance rights on the basis of Bankruptcy Code provisions that were intended "to prevent creditors and others from employing a debtor's bankruptcy filing to diminish post-filing contractual rights" and affirming district court's decision, which stated that "the contrary result would grant the insurers a windfall"); *In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) (stating that it would be "fundamentally wrong" to "allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge") (citation omitted).[10]

34. On this basis, courts across the country have ruled that insurers must pay the full value of the claims against an insolvent insured, even if the insured is unable to pay these claims itself. For example, in *National Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, the

---

[9] 2016 Policy, Prods./Completed Operations Liab. Coverage Form, § I.1.a; 2017 Policy, Prods./Completed Operations Liab. Coverage Form, § I.1.a; 2015 Policy, Prods. & Completed Operations Liab. Ins. Coverage Part, § I (similar language).

[10] *See also In re Jet Florida Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured."); *Tucker v. Am. Intern. Grp., Inc.*, 745 F. Supp. 2d 53, 65 (D. Conn. 2010) ("[C]ourts have 'reasoned that the insurance company should not be entitled to gain a benefit that was not intended or in any way computed within the rate charged for its policy.'") (quoting *In re Jet Florida*, 883 F.2d at 975); *In re Honosky*, 6 B.R. 667, 669 (S.D.W.V. 1980) ("The Court is not convinced that the Bankruptcy Code was intended to bestow such a benefit upon insurance companies.").

court rejected an argument from insurers that they were obligated to indemnify a post-bankruptcy trust “only for the actual sums which the Trust pays out to claimants.” No. CIV CCB-03-3408, 2012 WL 734176, at *1 (D. Md. Mar. 6, 2012). In finding that “the measure of the Insurers’ indemnification liability is not limited to the percentage paid out to the claimants,” *id.*, the court relied on the language in the confirmed plan and the purpose of the Bankruptcy Code:

> [T]he Plan of Reorganization for the Porter Hayden Company, which was confirmed by the Bankruptcy Court and approved by this court, specifically states that [it] is not intended to release Porter Hayden’s insurers from liability. The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations. The notion that bankruptcy of the insured should not accrue to the benefit of the insurers is well-established. ‘[A] party who is derivatively liable for the indebtedness of the debtor, such as its insurer, remains so after confirmation and the debtor’s discharge.’

*Id.* at *4 (quoting *In re Jason Pharmaceuticals, Inc.*, 224 B.R. 315, 322 (Bankr. D. Md. 1998)) (internal citation omitted).

35. Similarly, in *UNR Indus., Inc. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991), the Seventh Circuit expressly rejected an insurer’s argument that “the amount of [the policyholder’s] loss depends on how much money the Trust actually pays to [mass tort] victims with valid claims for the period in question.” *Id.* at 1105. The court reasoned that the insurer’s approach:

> threatens to confer a windfall on [the insurer] at the . . . victims’ expense. The reason for the potential windfall is that [the policyholder] UNR paid the Trust only a portion of the . . . victims’ actual damages in the bankruptcy proceedings. This discounting of the . . . victims’ damages had nothing to do with the merits of their claims. The discounting merely reflected the amount of UNR’s assets that the . . . victims could reach. [The insurer] may profit greatly from UNR’s bankruptcy if its obligations are based on the arbitrarily discounted amount that the . . . victims actually receive from the Trust.”

*Id.*; *see also ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011) (finding that policy provisions and public policy concerns

required the insurer to indemnify the insured for the full amount of loss rather than the discounted amount of the bankruptcy estate's payment).

36. Courts have similarly found that parties must use the full amount of allowed claims, even where a post-bankruptcy trust pays only *pro rata* shares, to determine whether a self-insured retention or underlying policy has been exhausted. *See, e.g.*, *Home Ins. Co. of Illinois v. Hooper*, 294 Ill. App. 3d 626, 632 (Ill. App. 1st Dist. 1998) (rejecting the insurer's argument that a bankrupt policyholder had to satisfy a policy's self-insured retention by payment of the actual amount of a liability before a claimant could obtain the proceeds of the policy); *see also UNR*, 942 F.2d at 1105, 1108 (noting with disapproval that the insurer "may profit greatly from [the debtor's] bankruptcy if its obligations are based on the arbitrarily discounted amount that the asbestos victims actually receive from the Trust," and that "[w]hether or not the underlying insurer performed the obligations *within* its coverage, [the excess insurer] remains liable for claims *beyond* that underlying coverage"); *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 255 (5th Cir. 1988) (applying allowed amount of claims to determine satisfaction of deductible, as the insurer "should not be allowed to escape its obligations under the insurance policy simply because its insured is in bankruptcy"); *ARTRA*, 2011 WL 4684356, at *3 (applying allowed amount of claims to determine trigger of insurer's coverage with respect to claims submitted to post-bankruptcy trust).

37. Mitsui cannot unilaterally and deliberately decide to ignore the basic tenets of bankruptcy law and an explicit order from this Court. The Debtors and their creditors reached agreement based on the understanding that the Trust would receive the Debtors' insurance rights, the proceeds of which would be used to pay personal injury claimants. If Mitsui were permitted

Case 17-11375-BLS Doc 4220 Filed 09/30/20 Page 16 of 20

to debase the Trust's rights under those Policies to a fraction of what they are worth, it would undermine an essential underpinning of the Plan.

38. Accordingly, this Court should enter an order enforcing the Plan and Confirmation Order and ordering Mitsui to comply with the Insurance Rights Transfer and Insurance Neutrality Provisions—i.e., indemnify the Trust *in full* for any liability incurred in connection with claims that fall within the scope of the Policies' coverage.

## II. The Court Has Jurisdiction Over This Core Proceeding.

39. It is "well established that courts retain jurisdiction to interpret and enforce their own orders" and "the terms of a confirmed Plan." *In re SemCrude, L.P.*, No. 08-11525 BLS, 2011 WL 4711891, at *5, *8 (Bankr. D. Del. Oct. 7, 2011) (Shannon, J.), *rev'd on other grounds in part sub nom. Cottonwood Partnership, LLP v. Kivisto* (*In re SemCrude L.P.*), No. BR 08-11525 BLS, Civ. No. 11-1174-SLR, 2012 WL 5554819 (D. Del. Nov. 15, 2012), *and subsequently rev'd on other grounds sub nom. In re SemCrude L.P.*, 796 F.3d 310 (3d Cir. 2015).[11] Multiple provisions in the Plan and Confirmation Order state that the Bankruptcy Court shall retain exclusive jurisdiction over the Insurance Rights Transfer and Insurance Neutrality Provision. *See*, *e.g.*, Confirmation Order ¶ 108 (establishing that the Court, "except as otherwise provided in the Plan, the Plan Documents, or this Order, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest extent as is legally permissible, including jurisdiction over the matters set forth in Article XI of the Plan.").[12]

---

[11] *See also In re Cont'l Airlines, Inc.*, 236 B.R. 318, 326 (Bankr. D. Del. 1999) (holding that the court had jurisdiction to enforce its confirmation order, issued six years prior); *In re Touch Am. Holdings, Inc.*, 401 B.R. 107, 116 (Bankr. D. Del. 2009) (rejecting the argument that confirmation of the plan, four years earlier, ended the court's jurisdiction).

[12] *See also* Plan §§ 11.1(a)(vii), (xi) ("[T]he Bankruptcy Court shall retain exclusive jurisdiction . . . for, among other things, the following purposes: . . . to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court; . .

40. In addition, the Court has jurisdiction over this matter because it is a core proceeding. "Subject matter jurisdiction over bankruptcy cases and proceedings originates in 28 U.S.C. § 1334, which grants district courts 'original and exclusive jurisdiction of all cases under title 11' and 'original and not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.'" *In re Touch Am. Holdings, Inc.*, 401 B.R. at 116. Bankruptcy jurisdiction extends to "four categories of title 11 matters: (1) cases under title 11; (2) proceedings under title 11; (3) proceedings arising in a case under title 11; and (4) proceedings related to a case under title 11." *Id.* at 117. The first three of these matters are considered "core" bankruptcy matters, while the fourth is considered "non-core."

41. In the Third Circuit, courts consult two sources when determining whether a proceeding is core. *See In re Axiant, LLC*, No. 09-14118 MFW, 2012 WL 5614588, at *3 (Bankr. D. Del. Nov. 15, 2012) (citing *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999)). First, courts determine whether the matter falls within the illustrative list of core proceedings set forth in 28 U.S.C. § 157(b). *Id.* Second, courts determine whether the proceeding (1) "invokes a substantive right provided by title 11," or (2) is a proceeding that "by its nature, could arise only in the context of a bankruptcy case." *Id.* (citing *Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.)*, 72 F.3d 1171, 1178 (3d Cir. 1996)).

42. The instant dispute—concerning the enforcement of the plain language of the Plan and the Confirmation Order—lies at the very heart of the bankruptcy and satisfies both prongs of the Third Circuit's test. First, this dispute falls within section 157(b)'s list of core proceedings, which includes "matters concerning the administration of the estate," *see* 28 U.S.C. § 157(b)(2)(A), and "other proceedings affecting the liquidation of the assets of the estate," *see*

---

. to hear and resolve disputes related to the Insurance Rights Transfer or the PI/WD Insurance Rights, to the extent permitted under applicable law").

28 U.S.C. § 157(b)(2)(O). The Debtors' transfer of the rights to the Policies to the Trust, and the Trust's resulting ability to pursue the full available proceeds from the Policies for distribution to personal injury creditors, was a crucial component of the Debtors' reorganization. Thus, any challenge to the Insurance Rights Transfer concerns the "administration of the estate" and the "liquidation of the assets of the estate."

43. Second, this proceeding invokes a substantive right provided by title 11, and it could arise only in the context of a bankruptcy case. The Bankruptcy Court approved the Insurance Rights Transfer expressly pursuant to sections 541(e), 1123(a)(5)(B), and 1129(a)(1) of title 11. *See* Confirmation Order ¶ 55. At the heart of Mitsui's position is the contention that the Debtors' insolvency and subsequent bankruptcy has fundamentally altered Mitsui's obligations under the Policies. Mitsui is relying on the requirements of the Bankruptcy Code—*pro rata* distribution of assets—as a defense to coverage. The parties' dispute as to the extent of insurance proceeds available to the Trust therefore is a dispute over the substantive rights provided by the Plan under the Bankruptcy Code and over the power of the Bankruptcy Court to enforce its own Confirmation Order. Such a dispute, "by its nature, could arise only in the context of a bankruptcy case." *Halper,* 164 F.3d at 836 (citation omitted).

44. Accordingly, any dispute concerning the Insurance Rights Transfer and Insurance Neutrality Provision is core because it is a "matter[] concerning the administration of the estate" and the "liquidation of the assets of the estate" under sections 157(b)(2)(A) and (O) of the Bankruptcy Code and is one that "by its nature, could arise only in the context of a bankruptcy case," *Halper,* 164 F.3d at 836 (citation omitted).[13]

---

[13] For the same reasons, the Court also would have subject matter jurisdiction to hear this core proceeding if it chose to apply the "close nexus" test. The U.S. Court of Appeals for the Third Circuit has held that a bankruptcy court's post-confirmation exercise of jurisdiction is appropriate "where there is a close nexus to the bankruptcy plan or

45. Consistent with these cases, the Court has jurisdiction over this core proceeding.[14]

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Trustee moves the Court for entry of an order enforcing the Plan and ordering Mitsui to (1) recognize the Trust as the holder of the Debtors' rights under the Policies, and (2) indemnify the Trust in full for any liability incurred in connection with claims that fall within the scope of the Policies' coverage.

Dated: September 30, 2020
Wilmington, Delaware

**BLANK ROME LLP**

*/s/ Stanley B. Tarr*
Stanley B. Tarr (DE No. 5535)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
E-mail: tarr@blankrome.com

-AND-

**BROWN RUDNICK LLP**
David J. Molton (admitted *pro hac vice*)
Gerard T. Cicero (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

---

proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement[.]" *In re Resorts Int'l, Inc.*, 372 F.3d 154, 168–69 (3d Cir. 2004). The Third Circuit has held that courts need not apply the "close nexus" test where, as here, a proceeding is core. *See, e.g., In re Seven Fields Dev. Corp.*, 505 F.3d 237, 260 (3d Cir. 2007) ("As we discussed in *Resorts*, the 'close nexus' standard only applies for the purposes of determining whether a federal court has jurisdiction over a non-core 'related to' proceeding in the post-confirmation context."). In the event that this Court determines that the "close nexus" test is still relevant for jurisdictional purposes, however, it is easily satisfied here, as the Trust's effort to enforce the Plan and Confirmation Order against Mitsui fits neatly within what courts in this Circuit consider a "close nexus." *See In re SemCrude, L.P.*, 2011 WL 4711891, at *4 ("The motion affects the interpretation and administration of the Plan because it requires the Court to determine if the Plan meant to, and did, transfer the claims asserted in the Oklahoma Litigation to the Litigation Trust.").

[14] Further, this matter can be brought as a motion in the bankruptcy proceeding itself, rather than as an adversary proceeding. Courts within this district have held that an adversary proceeding is not required "if the movants are 'merely seeking to enforce an order already in place.'" *In re SemCrude, L.P.*, 2011 WL 4711891, at *8 n.11 (quoting *In re Worldcorp, Inc.*, 252 B.R. 890, 895 (Bankr. D. Del. 2000)); *see also In re Lazy Days' RV Ctr., Inc.*, 724 F.3d 418, 425–426 (3d Cir. 2013) (rejecting the argument that the debtor needed to file an adversary proceeding where "the Bankruptcy Court was only adjudicating a motion to reopen in order to interpret and enforce its existing prior order"). Here, "the relief sought is the enforcement of an order previously obtained," *id.*, i.e., the Confirmation Order, and thus an adversary proceeding is not necessary.

E-mail: dmolton@brownrudnick.com
gcicero@brownrudnick.com

-AND-

**GILBERT LLP**
Kami E. Quinn (admitted *pro hac vice*)
Emily P. Grim (admitted *pro hac vice*)
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone: (202) 772-2200
E-mail: quinnk@gilbertlegal.com
grime@gilbertlegal.com

*Attorneys for Eric D. Green, in his capacity as Trustee of the Takata Airbag Tort Compensation Trust Fund*